[No. 541-3. Division Three. December 10, 1973.]

IVAN'S TIRE SERVICE STORE, INC., *Respondent,* v. GOODYEAR
TIRE & RUBBER COMPANY, *Appellant,* HARRY N. IVANS
*et al., Respondents.*

Paul F. Schiffner and Henry E. Stiles II (of Mac-Gillivray, Jones, Clarke, Schiffner & Johnson), for appellant.

John G. Schultz and Crane Bergdahl (of Leavy, Taber, Schultz & Bergdahl), for respondent.

Munson, J.—Ivan's Tire Service Store, Inc., as plaintiff, brought an action against the Goodyear Tire & Rubber Company for damages, alleging that Goodyear interfered with plaintiff's contractual agreements, illegally and improperly solicited plaintiff's customers in an attempt to destroy plaintiff's business, and by unfair pricing, intended to and did destroy plaintiff's business. Plaintiff asserted that defendant violated both the Unfair Practices Act, RCW 19.90, and the Consumer Protection Act, RCW 19.86. Defendant denied plaintiff's claims and asserted, as a cross claim, that it had furnished goods, wares and merchandise to plaintiff during the year 1970 and payment therefor in the amount of $37,782 was past due and owing. After a jury trial, a verdict was entered for the plaintiff in the amount of $223,682.09 and for the defendant upon its cross claim in the amount of $37,782.09. Both parties appeal.

In capsule form, we hold there is insufficient evidence to

justify submitting to the jury the issues relating to violations under the Unfair Practices Act, RCW 19.90; no evidence was introduced of defendant's per unit cost in purchasing tires. There is sufficient evidence to justify submitting the issue of unfair competition under the Consumer Protection Act, RCW 19.86. Other assignments of error are also discussed.

Plaintiff commenced business in Pasco, Washington, in 1965 as a wholesale and retail tire sales store with related services. During plaintiff's period of existence it had a non-exclusive dealership agreement with the defendant under which defendant supplied tires and other products to plaintiff. Under that agreement Goodyear retained the right to sell to other customers in the plaintiff's trade area and elsewhere.

Goodyear supplied to its dealers a dealer net pricing guidebook showing the various suggested selling prices for tires, starting with "list" price as the highest price and moving down through "code" price, "A" price, "AA" price, and "AAA" price. As concisely stated in plaintiff's brief, the final sales price was determined as follows:

> Depending upon the type of sale, i.e. wholesale, retail or commercial, the ultimate price is derived from a percentage of the "code" price. "A" price is the wholesale price which plaintiff utilized with small associate dealers who would pick up only an occasional tire . . . "AA" price was for a medium sized dealer that would make about $5,000.00 purchases annually. "AAA" was the established price for larger dealers, those who purchased $5,000.00 to $10,000.00 annually . . . The "AAA" price schedule was the best and lowest price that plaintiff would ever utilize to any of his accounts, commercial, wholesale or associate dealer . . . , barring any special price discounts given to plaintiff or unusual circumstances. . . . Plaintiff's normal buying price for these tires was "AAA" less ten percent.

Other pricing procedures were also established for other sales situations. For instance, net state prices were prices set by Goodyear to be charged by dealers when selling to

government or municipal agencies such as school districts and PUD's. On such sales plaintiff received a delivery commission of 10 percent. Goodyear also authorized sales at below established selling prices in order to meet prices being offered by competitive dealers. This was known as "price support." Plaintiff would submit a request for price support and Goodyear would then authorize a lower price. On these sales plaintiff was paid a delivery commission of 5 percent.

Plaintiff's business had improved yearly until 1970, when it faltered financially and ultimately closed in November of 1970. The gross sales for the first year of operation, 1965, were $95,000. In 1966 gross sales were $123,000 and the 1967 gross sales were $154,711. In the year 1968, plaintiff opened a branch store in Kennewick, Washington, and its gross sales for both stores for that year amounted to $283,238. In 1969 the gross sales were $346,218 and then in its final year, 1970, the gross sales dropped to $184,000.

The defendant opened its own company tire sales store in Richland, Washington, in April, 1970. There had been discussion between plaintiff and defendant about the opening of this store, which at one time had included discussions about the possibility of defendant purchasing plaintiff's business and plaintiff's president, Harry Ivans, then operating the defendant's store. Such a result did not occur.

Plaintiff alleged defendant effectively and illegally destroyed plaintiff's business when defendant established its own retail store, solicited many of plaintiff's established customers and succeeded in obtaining their business by selling tires to these customers at prices equal to or below the cost at which the plaintiff purchased tires from the defendant. It was further alleged that defendant sold tires to parties in plaintiff's trade area at prices which plaintiff could not meet and still receive a reasonable profit.

Defendant asserts 17 assignments of error upon appeal. A majority of the assignments of error involve the applicability of RCW 19.90 (the Unfair Practices Act), RCW 19.86 (the Consumer Protection Act), and instructions given in

the language of those statutes. Since numerous assignments refer to RCW 19.90, and because the trial court emphasized that statute, we will discuss the applicability of that act first. Thereafter, the applicability of RCW 19.86 to the facts in this case and the remaining assignments of error will be reviewed.

## RCW 19.90

### RCW 19.90.040

The trial court instructed[1] in the language of RCW 19.90.040, which reads as follows:

It shall be unlawful for any person engaged in business within this state to sell any article or product *at less than the cost thereof to such vendor,* or give away any article or product, for the purpose of injuring competitors or destroying competition, or to use any article or product as a "loss leader," or in connection with any sale to make or give, or to offer to make or give, any special or secret rebate, payment, allowance, refund, commission or unearned discount, whether in the form of money or otherwise, or to secretly extend to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, or to make or enter into any collateral contract or device of any nature, whereby a sale below cost is effected, to the injury of a competitor, and where the same destroys or tends to destroy competition.

---

[1] "INSTRUCTION No. 13

"The laws of the State of Washington provide as follows:
'It shall be unlawful for any person, engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with the intent to destroy the competition of any regular established dealer in such article or product, or prevent the competition of any person, who in good faith, intends and attempts to become such dealer, to discriminate between different sections of the same community, city, town or village in this state by selling or furnishing such article or product at a lower price in one section than in another

. . .

'The inhibition of this chapter against locality discrimination shall embrace any scheme of special rebates, collateral contracts or any device of any nature whereby such discrimination is, in substance or fact, affected in violation of the spirit and intent of this section: provided, however, that nothing in this section shall be construed to prohibit the meeting in good faith of a legal competitive price.'

(Italics ours.) Furthermore, the last sentence of instruction No. 8,[2] wherein the court said that a manufacturer is not permitted to unfairly compete with a dealer by lowering selling prices below cost,[3] can be read as based upon RCW

[2] "The laws of the State of Washington define the following terms as follows:
' "Cost" has its usual meaning . . . as applied to distribution means the invoice costs or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor;'
' "Cost of doing business" or "overhead expense" means all costs of doing business incurred in the conduct of such business and must include without limitation the following items of expense: Labor (including salaries of executives and officers), rent, depreciation, selling costs, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising.'
"The laws of the State of Washington further provide as follows:
'It shall be unlawful for any person engaged in business within this state to sell any article or product at less than the cost thereof to such vendor, or give away any article or product, for the purpose of injuring competitors or destroying competition, or to use any article or product as a "loss leader" or in connection with any sale to make or give, or to offer to make or give, any special or secret rebate, payment, allowance, refund, commission or unearned discount, whether in the form of money or otherwise, or to secretly extend to certain purchasers certain services or privileges not extended to all purchasers purchasing upon like terms and conditions, or to make or enter into any collateral contract or device of any nature, whereby a sale below cost is effected, to the injury of a competitor, and where the same destroys or tends to destroy competition.' "

[2] "INSTRUCTION No. 8
"The manufacturer who personally advertises a trademark article thereby creating a substantial consumer demand is required to allow the dealer a certain margin of gross profit to compensate for the reasonable 'cost of doing business.' It is the policy of the law that the manufacturer must do everything he can to keep the dealer-agent protected from price competition, and must not only enforce his system against other dealers, but if he himself becomes a dealer must abide by the 'costs' as established for other dealers. A manufacturer is not permitted to unfairly compete with a dealer by lowering selling prices below 'cost.' "

[3] "Cost" and "cost of doing business" are defined in RCW 19.90.010 as follows:
" 'Cost' has its usual meaning and in addition as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer, and *as applied to distribution means the invoice cost or replacement cost, whichever is lower, of the article or product to the*

19.90.040. The giving of both instructions is assigned as error.

In *Martin v. Aleinikoff*, 63 Wn.2d 842, 845, 389 P.2d 422 (1964), the court, "[f]or the purposes of clarity and reference," separated and numbered the several portions of RCW 19.90.040 as follows:

"It shall be unlawful for any person engaged in business within this state

"[1] to sell any article or product at less than the cost thereof to such vendor,

"[2] or give away any article or product, for the purpose of injuring competitors or destroying competition,

"[3] or to use any article or product as a 'loss leader,'

"[4] or in connection with any sale to make or give, or to offer to make or give, any special or secret rebate, payment, allowance, refund, commission or unearned discount, whether in the form of money or otherwise,

"[5] or to secretly extend to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions,

"[6] or to make or enter into any collateral contract or device of any nature, [a] whereby a sale below cost is effected, to the injury of a competitor, and [b] where the same destroys or tends to destroy competition." RCW 19.90.040.

The court in *Martin* stated that Nos. 1-6 were infinitive phrases, whereas [a] and [b] were adverbial clauses, and concluded that clause [a], *i.e.,* "whereby a sale below cost is effected, to the injury of a competitor" referred not only to phrase No. 6, "but to each antecedent to which it *may* refer without impairing the meaning of the sentence." *Martin v. Aleinikoff, supra* at 850. In that case it was held to be applicable to phrases Nos. 4 and 5.

---

*distributor and vendor plus the cost of doing business by said distributor and vendor;*

" 'Cost of doing business' or 'overhead expense' means all costs of doing business incurred in the conduct of such business and must include without limitation the following items of expense: Labor (including salaries of executives and officers), rent, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising;" (Italics ours.)

■ Based upon that language in *Martin,* the same reasoning must apply to infinitive phrases Nos. 1, 2, 3 and 6, unless such a reading would impair the meaning of the specific phrase. Phrase No. 1 specifically requires a sale below the cost to the vendor; phrase No. 2 can be read to prohibit the giving away of any article or product when the cost of the article or product given away, plus the cost of any product sold therewith, is less than, or below, the total sale price of the article sold; the loss leader prohibition in phrase No. 3 incorporates the below-cost provision since a loss leader itself is defined as a product sold at less than cost in RCW 19.90.010. As to phrases Nos. 4 and 5, they are covered by the *Martin* opinion; and phrase No. 6, in and of itself, contains the adverbial clauses which are required to be included in an alleged violation of that phrase.

In the instant case, plaintiff has failed to show the per unit cost to Goodyear of tires sold by Goodyear in plaintiff's trading area, as is required to show a violation of RCW 19.90.040. Plaintiff has introduced a financial statement of Goodyear's Richland store for the period from the opening of the store until December 31, 1970. It urges that we accept the overall result of the financial statement, namely, that the store incurred an operating net loss of some $33,000 for the period covered, as evidence that sales of tires were made below cost. This we cannot do. Although the primary business of defendant's Richland store was that of tire sales, the store also performed related service functions and carried additional lines of merchandise, such as television sets, stereo equipment, washers, dryers, other appliances and some accessory automobile parts. In its financial statement, all of these items are listed under the category of total inventory and gross sales, along with the total overall costs of doing business. There is no breakdown as to what the costs of the tire purchases by the defendant were or the value which they ascribed to any of the tires. There is a sales figure for tires and tubes of $103,916 and a tires and tubes inventory figure of $89,127, both figures being for the year 1970; but nowhere is there a breakdown

as to how those total figures are computed, either by tire size, quantity, etc. Mr. Harold Moos, the assistant district manager in charge of retail stores for defendant, stated during cross-examination that he could not tell the cost per unit to sell a tire or the costs of buying merchandise from this financial statement. We are unable to find any evidence in the record of the per unit cost of tires to defendant which were eventually sold to plaintiff or plaintiff's competitors, or the costs incurred in such sales. Therefore, there is no evidence that there were sales made by defendant below the cost to defendant. Instructions relating to RCW 19.90.040 were erroneously given.

As a corollary to plaintiff's argument that defendant's sales to plaintiff's competitors were below cost, it argues that the cost referred to in RCW 19.90 is the cost at which tires were sold to *plaintiff*. Again we must disagree. Sales below cost in the context of RCW 19.90 clearly refer to the vendor's costs, *i.e.,* defendant's costs.

In furtherance of this argument, plaintiff contends that it is mandatory upon the defendant, as the manufacturer and distributor,[4] when competing with its dealers for tire sales, to refrain from selling its product to customers of the dealer at a price less than that with which the dealer could compete and still pay his reasonable cost of doing business. Plaintiff takes the position that, in the instant case, defendant must charge its customers at least 15 percent more than the price at which plaintiff can buy tires from defendant in order to allow the plaintiff a reasonable amount to cover his costs of doing business plus a nominal profit. This theory was presented in instructions Nos. 8, 11 and 12, to which error has been assigned, and in instruction No. 20, to which no exception is here taken. There is nothing within any of the sections of RCW 19.90 which would support such a contention.[5] However, this theory may be a factor which

---

[4] Plaintiff relies upon 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 24.3 (c) (3d ed. 1967), but a retail price maintenance theory is not analogous. *See* page 124 *infra.*

[5] We are unable to discern whether the legislature contemplated this vertical method of distribution when it enacted this legislation in 1939.

can be taken into consideration by the trier of fact in determining whether defendant was guilty of "unfair methods of competition" or "unfair or deceptive acts or practices in the conduct of any trade or commerce" pursuant to RCW 19.86.020 as discussed *infra*.

Defendant further challenges the portion of instruction No. 13 relating to the unlawful giving away of articles, loss leaders, special rebates, et al., prohibited by RCW 19.90.040. This part of the instruction may have been proper if plaintiff showed the cost of the products to the defendant store as being below the sales price of the same products. As discussed above, there is insufficient evidence to support the giving of that instruction because of the lack of evidence showing the cost of the products to defendant's store.

*RCW 19.90.020*

The trial court also instructed, in instruction No. 13, in the language of RCW 19.90.020 as follows:

"It shall be unlawful for any person, engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with the intent to destroy the competition of any regular established dealer in such article or product, or prevent the competition of any person, who in good faith, intends and attempts to become such dealer, to discriminate between different sections of the same community, city, town or village in this state by selling or furnishing such article or product at a lower price in one section than in another

. . .

"The inhibition of this chapter against locality discrimination shall embrace any scheme of special rebates, collateral contracts or any device of any nature whereby such discrimination is, in substance or fact, *affected* in violation of the spirit and intent of this section: provided, however, that nothing in this section shall be construed to prohibit the meeting in good faith of a legal competitive price."

As one basis for its challenge to the giving of this instruction, defendant contends that there was no evidence pre-

Merchandising distribution methods have markedly changed in the last quarter century.

sented showing that defendant discriminated between different sections of the same community in its tire sales. We agree. We are unable to find any evidence of discriminatory tire sale prices given by Goodyear to competitors of plaintiff in the trading area commonly denoted as the Tri-Cities area. If anything, it is the consistency of defendant's tire sale prices which the plaintiff attacks, rather than any geographical discriminatory pricing, which is the touchstone of RCW 19.90.020.

Entwined in defendant's challenge to the portion of instruction No. 13 setting forth RCW 19.90.020 is defendant's contention that the court erred in instructing the jury as a matter of law in instruction No. 18 that political boundaries bear no economic importance and that the Tri-Cities area was one metropolitan marketing area. RCW 19.90.020 prohibits discriminatory pricing between different sections of the same community, city, town or village. We believe the court was correct in giving instruction No. 18. To interpret RCW 19.90.020 to refer to strictly political boundaries of a community, city, town or village is to overlook the development of shopping centers outside the political boundaries of what is nominally called a community, city, town or village. We concur with the trial court that political boundaries are not the determining factors. The Tri-Cities area is the only metropolitan trading area of significance, competition-wise, within a radius of approximately 50 miles. The evidence showed that both parties sold to customers wherever they resided in the Tri-Cities area without restricting their sales to geographic boundaries. It is also interesting to note that one of the reasons propounded by the defendant for locating its store in Richland was its considered opinion that it was not garnishing its proper percentage of the overall tire business within the Tri-Cities area. We do not believe it is a travesty upon legislative intent to consider the Tri-Cities area as one metropolitan marketing area under RCW 19.90.020. Defendant's assignment of error in this regard is without merit.

Defendant also challenges the inclusion in instruction No.

13 of the definition of cost and costs of doing business as set forth in RCW 19.90.010.[6] What we have previously said regarding the definition of cost and the lack of evidence, with respect thereto, renders the inclusion of these definitions improper.

*RCW 19.90.120*

The final instruction given pursuant to RCW 19.90 here challenged is instruction No. 14, wherein RCW 19.90.120 was set forth as follows:

"In any civil . . . action proof of average overall cost of doing business for any particular inventory period when added to the cost of production of each article or product, as to a producer, or invoice or replacement cost, whichever is lower, of each article or product, as to a distributor, shall be presumptive evidence of cost . . ."

There is no evidence to support the giving of this instruction inasmuch as there is no evidence as to the production, replacement, or invoice cost to defendant of the product, namely tires. As set forth above, the proof of this item by a year-end financial statement was insufficient.

In summary, there is insufficient evidence in the record to support the giving of instructions based upon either RCW 19.90.040 or 19.90.020. Upon this basis, this case must be reversed.

*RCW 19.86*

■■ The second primary basis for recovery relied upon by plaintiff in this case is the Consumer Protection Act, RCW 19.86. The primary reliance is apparently placed upon RCW 19.86.020, which reads as follows: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Numerous instructions to which error has been assigned, including at least instructions Nos. 8, 12, 15 and 19, or parts thereof, are based upon the unfair methods of competition or unfair practice prohibitions of RCW 19.86.020. We believe the total facts of this

---

[6]*See* footnote 3.

case do present a jury question as to whether defendant did in fact violate RCW 19.86.020.

The touchstone of this nation's economy has been competition.

> Ours is a land in which the people like to see endeavor stand on its own feet, fight its own way to the front, and having arrived at the front receive such crowns of victory as it may, legitimately. This fight must be made fairly, it must be made with one's own weapon.

*Ethyl Gasoline Corp. v. Klibanow*, 1 F. Supp. 584 (N.D. Tex. 1932).

The term competition immediately calls to mind a struggle between people. It has been recognized by the legislative branch as an area which needs to follow certain guidelines. In none of the legislation, federal or state, have we found a definition for fair or unfair competition. But before legislation there was a common-law concept of unfair competition, or "passing off," as it was called in England, of one's goods as those of a competitor. *Cf. Goodyear's India Rubber Glove Mfg. Co. v. Goodyear Rubber Co.*, 128 U.S. 598, 32 L. Ed. 535, 9 S. Ct. 166 (1888). Legislation has broadened the term to "unfair methods of competition" and has seen fit to leave the term not specifically defined because:

> There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task."

*Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240, 31 L. Ed. 2d 170, 92 S. Ct. 898 (1972).

Notwithstanding the lack of specific definition, the phrase "unfair methods of competition" has withstood the challenge of constitutional vagueness. *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 510 P.2d 233 (1973); *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 274, 501 P.2d 290 (1972). *Cf.* 55 Am. Jur. 2d *Monopolies* § 738-39 (1971).

While federal legislation created the Federal Trade Commission, our legislature, in enacting RCW 19.86, did not create such an administrative agency. Thus, the defining and proclaiming of the bounds of these terms falls upon the courts. As we have previously noted, when embarking upon such a course, we believe the court should only consider the factual pattern before it and let the law develop on a case-by-case basis. *Mason v. Ellsworth*, 3 Wn. App. 298, 474 P.2d 909 (1970).

One writer, however, has attempted to define "fair competitive conduct" by describing it as a "[s]truggle according to game-like rules by means of constructive effort subject to the natural conditions of the market." 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 6.2 (f), at 182 (3d ed. 1967). He typifies the struggle more as a horserace rather than a football game—where physical energy is expended for self-propulsion towards obtaining a common prize, rather than a battery against another to reach the goal. 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 6.2(a), at 168 (3d ed. 1967). It has been stated that: "the tendency of the law 'has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade. The tendency still persists.' Restatement, Torts, Volume III, page 540." *Q-Tips, Inc. v. Johnson & Johnson*, 206 F.2d 144 (3d Cir. 1953), *cert. denied*, 346 U.S. 867, 98 L. Ed. 377, 74 S. Ct. 106 (1953).

In this case plaintiff urges that defendant's sales of tires to plaintiff's customers for a price either below, equal to, or slightly higher than the cost of purchase by plaintiff from the defendant amounts to unfair competition. It urges that the defendant, when in competition with a dealer such as plaintiff, must sell its products to nondealers at a price sufficiently high so that the dealer can compete and receive a reasonable profit, plus pay its reasonable cost of doing business. These theories are included in the instructions cited above.

To hold defendant guilty of unfair competition merely

because of pricing its products in that manner is not correct. Defendant does not owe plaintiff a profit. As stated in *Secatore's, Inc. v. Esso Standard Oil Co.*, 171 F. Supp. 665 (D. Mass. 1959), defendant is under no obligation to sell to plaintiff at a lower price than it charges to customers, who buy directly from it, in order to enable plaintiff to compete with it for the business of those customers. But unless it does this, plaintiff will never be able to compete successfully with defendant, at least with respect to price. *Cf. Webster v. Sinclair Refining Co.*, 338 F. Supp. 248, 252 (S.D. Ala. 1971).

Plaintiff's position, as set forth above, is based upon a retail price maintenance system theory as that system is discussed in 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 24.3(c) (3d ed. 1967). However, the situation here is not analogous to such a system. It is true that defendant does *recommend* to the plaintiff a *proposed* retail sales price as stated in a Goodyear net pricing guidebook distributed to dealers, as previously set forth. Furthermore, defendant Goodyear also does set forth stated prices for other various types of tire sales; and plaintiff, by selling according to those terms, is granted a certain percentage of profit. But plaintiff is not required to maintain an established resale price. Consequently, on the basis of pricing alone, we would not find any unfair methods of competition in this case.

This is not to say that the defendant's conduct, as shown by the evidence of prices at which defendant sold tires to customers in the Tri-Cities area, when considered in light of the entire circumstances surrounding the activities between these parties, does not amount to an unfair method of competition under RCW 19.86.020. As stated in *State v. Ralph Williams' North West Chrysler Plymouth, Inc., supra* at 279, an unfair method of competition is: "tested in light of the conduct with which the defendant is charged, . . ."

██ In this case, in addition to the evidence showing the prices charged by defendant Goodyear, there is evi-

dence from which the trier of fact could find that the defendant improperly utilized its knowledge of plaintiff's customer lists and solicited those customers with intent to destroy plaintiff's business. We note, however, that the jury was instructed that the use by the defendant of information obtained from the plaintiff concerning customers and prices charged by plaintiff was an unfair method of competition as a matter of law. We believe that whether defendant's conduct amounted to an unfair method of competition was a factual question for the jury and instructing as a matter of law was improper.

It should also be noted that the dealership contract between the parties provided for a termination by either party upon a 30-day notice. Such a termination provision is permissible. *See Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir. 1972). While negotiations were held with respect to defendant purchasing plaintiff's business and with Mr. Ivans going to work for defendant, there is no evidence indicating any conduct by either party in an attempt to terminate their contract. Defendant's reasons for not canceling its contract with plaintiff may be relevant and of probative value when considered in light of its other conduct.

The foregoing evidence, when considered as a whole, was sufficient to support a finding by the trier of fact that defendant was guilty of unfair competition and that plaintiff was entitled to damages. However, since instructions Nos. 8, 11, 12, 15 and 19, in defining unfair competition for the jury, spoke only in terms of tire pricing practices by the defendant, they were erroneously given. Defendant's tire pricing practices, alone, were insufficient to present a question of unfair competition.

### OTHER RELEVANT ASSIGNMENTS OF ERROR

Inasmuch as this matter must be remanded for a new trial, we shall discuss other assignments of error which may be relevant upon retrial.

Defendant attacks the giving of instruction No. 22, which relates to damages and reads as follows:

When considering damages, if your award is for the plaintiff, you may consider the general depreciation of the value of the plaintiff's business as a going concern, reflecting the reduced business getting ability of the business and the affect which impairment of its competitive position may be expected to have on its prospects for future operation and growth, if any.

We find no error, noting *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wn.2d 740, 504 P.2d 1139 (1973). The court therein in dicta at page 743 states:

We will assume, therefore, that the damages recoverable would be those which could be recovered in a common-law action for "unfair competition." Those damages are described in the Restatement of Torts § 746 (1938). They include lost profits, losses due to reduction in prices occasioned by the competition, harm to reputation, and expenditures reasonably made by the plaintiff to prevent prospective customers from being misled by the defendant's conduct.

This list of damages would appear to be more inclusive than that set forth in the instruction given by the court in the instant case. In any event, should the matter come on for retrial, the parties now have the benefit of the Supreme Court's statements concerning allowable damages in this type of case.

█ Defendant assigns as error the inclusion in instruction No. 1 of an allegation contained in plaintiff's complaint which was not submitted to the jury. Instruction No. 1 merely set forth an outline of plaintiff's allegations, one of which, breach of the dealer agreement, was never submitted to the jury. We find no prejudice resulting from this list of original allegations. *Mulkey v. Spokane, P. & S. Ry.*, 65 Wn.2d 116, 122, 396 P.2d 158 (1964).

█ Defendant also assigns error to instruction No. 9 wherein it was stated in part that "one who induces or otherwise purposely causes a third person not to enter into or continue a business relation with another is liable for the harm caused thereby." Defendant now challenges this

instruction as being unsupported by substantial evidence. Defendant's exception to this instruction at trial, however, went to whether the instruction properly defined the tort of unlawful interference with the business of another. Our review of the record fails to disclose that the trial court was in any way advised of the basis of defendant's objection to instruction No. 9, which is now made on appeal. Failure to take proper exception upon the grounds now urged on appeal precludes us from reviewing the alleged error. *State v. Myers,* 6 Wn. App. 557, 572, 494 P.2d 1015 (1972).

The remaining assignments of error raised by defendant charged the court with committing error in the following ways: (1) In submitting a second form of verdict to the jury; (2) in failing to grant defendant a new trial because of misconduct of plaintiff's counsel during closing arguments; and (3) in failing to grant a new trial because the damages awarded were excessive and the result of passion and prejudice by the jury and beyond the range of substantial evidence. In light of the holding in this case, these assignments of error need not be discussed.

■ Defendant assigns error to the trial court's failure to award interest on its cross claim judgment for the period from May 20, 1970, the date when the accounts became due, until the entry of judgment. Plaintiff argues that defendant is not entitled to interest, inasmuch as the jury verdict shows plaintiff was entitled to recover from the defendant on the basis of unfair methods of competition, *i.e.,* this award overrides and eliminates any liquidated amount due and owing to defendant. We do not accept plaintiff's reasoning. A liquidated indebtedness was incurred on May 20, 1970. If an indebtedness is liquidated, interest thereon is allowed as a matter of right. *Beedle v. General Inv. Co.,* 2 Wn. App. 594, 469 P.2d 233 (1970). Therefore, defendant is entitled to interest on its judgment as of May 20, 1970, to the date of judgment herein.

Plaintiff cross-appeals from the failure of the trial court to treble the verdict rendered by the jury and to further

award plaintiff reasonable attorney fees pursuant to RCW 19.86.090.

In view of our holding, it is not necessary to consider this allegation. However, we do note our belief that the facts presented hereunder present only a violation of RCW 19.86.020, which is excluded from the treble damages provision except to the extent of $1,000 maximum.

 Lastly, as justification for awarding plaintiff's attorney's fees, the trial court was offered a contingent fee agreement and testimony as to its reasonableness. The court did not accept as reasonable that agreement. Plaintiff, if successful, is entitled to reasonable attorney's fees. *Tradewell Stores, Inc. v. T.B. & M., Inc.*, 7 Wn. App. 424, 500 P.2d 1290 (1972). Should plaintiff be successful upon retrial, perhaps another manner of justification of attorney's fees would be acceptable to the court. We make no determination on that issue other than to say a contingent fee agreement between a party and his counsel is not binding upon the court in its determination of the amount of a reasonable attorney's fee.

The judgment in favor of plaintiff is reversed and the matter remanded for a new trial. Defendant's judgment is modified to include interest from May 20, 1970.

GREEN, C.J., and McINTURFF, J., concur.

Petition for rehearing denied February 20, 1974.

Review granted by Supreme Court April 29, 1974.