**WESTINGHOUSE ELECTRIC CORPORATION, a corporation, Plaintiff-Appellant,**

v.

**CX PROCESSING LABORATORIES, INC., a corporation, Defendant-Appellee.**

**WESTINGHOUSE ELECTRIC CORPORATION, a corporation, Plaintiff-Appellee,**

v.

**CX PROCESSING LABORATORIES, INC., a corporation, Defendant-Appellant.**

**Nos. 72–3080, 72–3081.**

United States Court of Appeals, Ninth Circuit.

Aug. 28, 1975.

Coleman P. Hall (argued), Seattle, Wash., for Westinghouse Electric Corp.

Betty B. Fletcher (argued), William L. Dwyer (argued), Seattle, Wash., for CX Processing Laboratories, Inc.

## OPINION

Before CHOY and GOODWIN, Circuit Judges, and BURNS,* District Judge.

BURNS, District Judge.

This is a contract dispute between Westinghouse Electric Corporation, a Pennsylvania manufacturer of Photo-flash cubes and bulbs (lamps), and CX Processing Laboratories, Inc., one of its Washington distributors. Jurisdiction is the result of diversity, pursuant to 28 U.S.C § 1332. CX's counterclaim also alleges that Westinghouse is guilty of antitrust violations prohibited by the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. Jurisdiction is provided by 15 U.S.C. § 15.

*FACTS:*

Westinghouse is one of the three major manufacturers of photo-flash lamps in the United States. CX is a Seattle company engaged in the photo-finishing business. It is common for photo-finishers to also serve as distributors of photo-flash equipment, and CX had done so previously for Sylvania, another manufacturer. During the summer of 1968, Tom Ryan, a Westinghouse representa-

---

* Honorable James M. Burns, United States District Court for the District of Oregon, sitting by designation.

tive, began soliciting Leonard Tall, CX's principal owner, in hopes of converting CX to Westinghouse photo-flash products. Tall eventually agreed to distribute Westinghouse lamps. On December 1, 1968, he signed a "Westinghouse Electric Corporation, Lamp Division, Photo-Flash Lamp Distributor Franchise" agreement (P.F.D. agreement). The parties continued their negotiations, however, because the incentives for distributors provided by Sylvania continued to be more attractive than those offered by Westinghouse. In late January of 1969, Ryan submitted a "Form S–430," an internal Westinghouse form used by sale representatives to request authorization to meet or beat incentive offers made by Westinghouse's competitors. After receiving authorization for a single order of approximately 23,000 cases of lamps, he informed Tall that Westinghouse would match Sylvania's offer up to this amount. On February 24, 1969, Sylvania circulated an incentive offer of one free case of photo-flash lamps with every six purchased. Ryan advised Tall on February 27 that Westinghouse would meet this offer, and CX began test marketing to determine what quantity it could resell.

On March 11, Leonard Tall prepared an order entitled "Master Purchase Order" (M.P.O.) for 90,000 cases of photo-flash lamps. The order included the words: "Shipment of any portion of this order constitutes acceptance of all terms and conditions herein." Ryan took this order to his district manager, Fred May. On March 12, Fred May telephoned Fred Wood, Westinghouse's zone manager in San Francisco, and read him the entire agreement. To meet CX's current customer demands, Wood instructed immediate shipment of 4,900 cases. He affirmed this instruction in writing March 14. He also forwarded a copy of the M.P.O. to Westinghouse's national sales manager in Bloomfield, New Jersey, for home office approval.

The parties disagree as to whether Tall was ever informed that such approval was necessary. Westinghouse contends that in shipping these lamps without home office approval, it was not operating under the M.P.O., but rather in accordance with the P.F.D. agreement and the previous authorization for 23,000 cases of lamps in Ryan's S–430 form. The first shipment arrived in Seattle on March 17. A portion was delivered directly to Bazaar Stores, one of CX's customers, and the remainder to CX itself. CX paid for both deliveries.

On March 18, Leonard Tall met with Fred Wood and other Westinghouse executives to discuss sales. Two days later, on March 20, Tall was informed that no further shipments would be made. Originally Westinghouse claimed that an inventory shortage was the reason for this decision. Later it relied on the fact that the copy of the M.P.O. sent to its home office had been temporarily misplaced and therefore not acted upon until March 20. CX contends that the reason for this refusal to continue delivery was a series of inquiries and complaints by other distributors regarding CX's special price arrangements with Westinghouse. Since CX had already contracted for resale of a large portion of the order in reliance upon the agreement, Tall threatened to sue if delivery was not completed.

In early April Westinghouse sent its manager of marketing administration, Don Brown, to Seattle. After consultation with other Westinghouse executives, it was agreed that the company would honor the terms of the M.P.O. up to 23,000 cases, the quantity earlier authorized in its S–430 form. Ultimately Westinghouse sold and shipped approximately 17,000 additional cases of photo-flash lamps to CX. Their value according to the prices established by the M.P.O. was $121,419.40. Westinghouse also offered to sell the balance of the 90,000 cases at its regular prices. CX declined this offer and purchased cover goods from another manufacturer, General Electric. It also refused to pay for the 17,000 cases already delivered.

Westinghouse brought suit to recover the unpaid amount. CX alleged as an

affirmative defense that Westinghouse had breached its contract to sell and had not fulfilled its terms calling for drop shipments to CX's customers. The company counterclaimed against Westinghouse for damages resulting from the breach. It also charged that the breach and refusal to deal with CX were pursuant to a combination in restraint of trade, in violation of Sections 1 and 2 of the Sherman Act.

A jury verdict awarded Westinghouse the entire amount of $121,419.40 for the 17,000 cases of lamps. The verdict also awarded damages of $90,980.00 to CX for its breach of contract counterclaim. This amount was later reduced by consent to $88,035.00. Westinghouse received interest on only $33,384.40, the difference between the two judgments. The district court dismissed CX's antitrust claim for lack of evidence.

*ISSUES:*

CX appeals from the dismissal of its antitrust claim and from the court's refusal to permit the presentation of certain evidence in support of it.

Westinghouse cross-appeals, claiming error on five separate issues:

1) Admitting parol evidence as to the terms of shipment and payment;

2) Erroneous jury instructions by the district court, and its refusal to give various requested instructions;

3) Failure to withdraw from the exhibits given to the jury those relating to CX's antitrust claim, which had previously been dismissed;

4) Refusal to reduce the jury's verdict on CX's counterclaim for breach of contract by the amount of the freight charges;

5) Failure to grant interest to Westinghouse on the entire amount awarded it by the jury's verdict.

*CX's Antitrust Claim*

CX contends that its counterclaim alleged both a "vertical conspiracy" between Westinghouse and its distributors to set prices in restraint of trade, and a "horizontal conspiracy" between Westinghouse, Sylvania and General Electric, as manufacturers, for the same purpose. Westinghouse objected the day before trial that it had not been fairly placed on notice of this second allegation. The district court then ruled that this horizontal conspiracy was not properly before the court because it had not been included in CX's original counterclaim or otherwise presented early enough to be considered.

CX's description of the alleged combination and conspiracy is provided in Section 13 of its "Answers and Counter-Claims."

"Most of the photoflash lamps produced in the United States, upon information and belief approximately 90% thereof, are manufactured by three large corporations, to wit plaintiff, GE and Sylvania. The said three large manufacturers have adopted and followed a system of price leadership and adherence, the purpose of which is to maintain stabilized flashbulb prices and to prevent serious price competition among the manufacturers. Plaintiff holds a substantial portion of the flashbulb industry and markets its flashbulbs in large part through distributors, i. e. businesses which purchase and take title to the commodities and resell them to retail photography stores, supermarkets, drug stores and other purchasers. Commencing some time prior to 1969, at a date presently unknown to defendant, continuing to the present time, plaintiff and certain of its distributors have been engaged in a combination and conspiracy in restraint of trade, and have conspired and attempted to monopolize a field of interstate commerce i. e., the business of marketing flashbulbs throughout the United States."

Although this paragraph provides an historical description of Westinghouse, Sylvania, and General Electric that would permit an action to be brought against them for antitrust violations, the charging portion of this section refers only to Westinghouse and its distributors. Rule

8 of the Federal Rules of Civil Procedure requires that:

"A pleading which sets forth a claim for relief . . . shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."

CX's counterclaim does not satisfy this requirement.

■ Nor did CX press this horizontal conspiracy claim until shortly before trial. There is nothing of significance in the interrogatories of either party to indicate that this issue was originally included as part of the case. CX's attorney admitted that no mention of either Sylvania or General Electric had been made in response to the court's inquiry at a pre-trial conference held approximately two weeks before the trial as to issues involved.[1] The first concrete notice of this claim received by Westinghouse was contained in a letter from CX dated March 14, less than two weeks before trial. The trial court's conclusion that the claim, in the form it was pleaded, came too late to be properly considered will not be disturbed.

■ CX was allowed to present evidence of a "vertical conspiracy" between Westinghouse and its distributors to stabilize prices, prevent price cutting, and control sales territories. At the close of the evidence the trial court dismissed this claim because a vertical conspiracy had not been shown. It found only that Westinghouse had refused to deal at the original contract price, which the court did not believe to be in violation of the Sherman Act. We agree.

■ The standards for granting a directed verdict in an antitrust case are set out in *Chisholm Brothers Farm Equipment Co. v. International Harvester Company*, 498 F.2d 1137 (9th Cir.

1974). Although summary procedures should be used sparingly in antitrust litigation where motive and intent play a significant role, nevertheless, if the plaintiff "does not present enough evidence within his case in chief to support a reasonable finding in his favor, a district court has a duty to direct a verdict against him."[2] Although CX was entitled to benefit from all reasonable inferences to be drawn from its evidence, to avoid a directed verdict it was required to present substantial evidence that could support a finding by reasonable jurors in its favor. "Substantial evidence is more than a mere scintilla." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Our review of CX's evidence is based on these considerations.

■ Resale price maintenance is a *per se* violation of the Sherman Act. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. White Motor Co.*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Albrecht v. Herald Company*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Evidence of resale price maintenance must be present, however, before this doctrine can come into play. Generally, a company may deal and refuse to deal with whomever it pleases, without fear of violating antitrust laws. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). To constitute a violation, a refusal to deal must also be an effort to restrain trade. *United States v. Parke, Davis & Co., supra*, 362 U.S. at 44, 80 S.Ct. 503.

CX contends that Westinghouse's temporary refusal to deal, followed by its refusal to continue selling at the original discount price, was an attempt to control the resale price of photo-finish lamps, motivated by complaints from other dis-

---

1. CX's claim of horizontal conspiracy is also diminished by the history of its relationship with these three manufacturers. After successfully causing Sylvania and Westinghouse to compete for its business and benefiting from this competition, CX turned to General Electric when it became necessary to purchase cover goods because of Westinghouse's breach of contract. This free flow of both goods and competition is hardly what one would expect as part of a horizontal price-fixing conspiracy.

2. *Chisholm, supra*, at 1139–40.

tributors about CX's pricing policies. No evidence was presented, however, to show that Westinghouse had attempted to dictate resale prices to CX, or that the company's decision to deal only at regular prices following a temporary refusal to deal at all, was for this purpose. Nor was there direct evidence that the communication between Westinghouse and its distributors was for the purpose of establishing a price-fixing agreement, as CX contends. Westinghouse's executives did testify to numerous calls from distributors, but indicated that these were requests for a lower wholesale price similar to the one enjoyed by CX. CX argues that the use of the word "complaint" by these witnesses in describing these conversations is evidence of an illegal conspiracy. We disagree, because the word was used primarily when encouraged by the form of the question posed by CX's attorney.[3] The only evidence, which perhaps does not even amount to a scintilla, that these conversations resulted in an agreement to fix prices was unsubstantiated opinion testimony of Leonard Tall.

■ The Sherman Act also prohibits the vertical restriction of sales territories by a manufacturer. *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Although not ruled upon directly by the district court, this issue is raised on appeal. Although CX contends that Westinghouse restricted the sales territory of its distributors, CX provides only one example. In late February or early March of 1969, CX had approached Besco, a California retailer, and offered to supply it with photo-flash lamps. This was during the period when CX was still testing its potential market and before Leonard Tall had submitted the Master Purchase Order to Westinghouse. Besco related this offer to its regular supplier, Berkey Photo, another of Westinghouse's distributors. Berkey, in turn, complained to Westinghouse about CX's price. As a result, Fred May, the Seattle district manager, called Leonard Tall on March 14 and asked him to withdraw the offer because of the problems it had created. May testified that Tall voluntarily complied. Tall testified that he did so only because May threatened to cancel the contract with CX if he did not. However, there was no evidence that Westinghouse had forced Tall to withdraw the offer, or that its later refusal to deal at the original price was in any way related to this incident. Nor was there evidence that Westinghouse had attempted to fix CX's resale prices in California or prevented it from selling to retailers within the state.

This is not sufficient evidence of restraint of trade to constitute an antitrust violation. CX's own case authority sets out the requirements for illegal resale price maintenance or allocation of customers and territory in violation of Section 1 of the Sherman Act.[4] In each instance the guilty manufacturer established either an express resale price or a method to prevent resale to either certain customers or within certain territories. Generally, these policies were imposed upon wholesalers or retailers

---

**3.** One of Westinghouse's witnesses even objected to being asked a question that included the word "complaint."

**4.** Resale price maintenance: *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Girardi v. Gates Rubber Company Sales Division, Inc.*, 325 F.2d 196 (9th Cir. 1963); *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *United States v. Uniroyal, Inc.*, 300 F.Supp. 84 (S.D.N.Y.1969); *Adolph Coors Company v. Federal Trade Commission*, 497 F.2d 1178 (10th Cir. 1974); *Burton Supply Company, Inc. v. Wheel Horse Products, Inc.*, 1974-2 Trade Cases § 75,224 (N.D.Ohio 1974). Restriction of territory: *United States v. White Motor Company*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *United States v. Arnold Schwinn & Company*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *GTE Sylvania, Inc. v. Continental T.V. Inc.*, 1974 Trade Cases § 75,072 (9th Cir. 1974).

through a well-defined enforcement scheme. Westinghouse committed none of these violations.

*Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (D.C.N.Y.1968), which the district court relied upon for its decision, is a more appropriate case by which to evaluate CX's antitrust claim. Carbon Steel was a wholesaler who purchased some of its steel from Wood Steel, a manufacturer. Following several customer complaints, Wood refused to fill Carbon's orders because Carbon had been selling imported steel at a lower price and thereby taking away some of Wood's orders and those of its customers. Carbon filed suit, alleging that Wood had attempted to monopolize the market in violation of the Sherman Act. In ruling against Carbon, the court stated:

> "The record here fails to disclose any facts which support an inference that Wood went 'beyond mere announcement of his policy and the simple refusal to deal . . . .' Significantly, Wood had no general policy to block the sale of imports by its customers and no enforcement machinery to gain adherence to any such policy. Wood made no effort to implicate any third parties in the detection of customers selling imported steel, nor did it enlist the aid of third parties in attempting to dissuade Carbon Steel from continuing its sales of foreign steel. A combination violative of Section 1 of the Sherman Act cannot be implied from the fact that some of Wood's customers complained of Carbon Steel's practices, since it was the normal working of the marketplace for them to have done so." (289 F.Supp. at 588)

*Butera v. Sun Oil Company, Inc.*, 496 F.2d 434 (1st Cir. 1974) is an example of pricing activities which do not violate the Sherman Act. Butera owned a retail gasoline station and sold Sun products. Sun's competitive allowance—a discount from the "tank-wagon" price *at time of delivery*—permitted its retailers to make a reasonable profit while competing with dealers of other brands. Because Butera's tank capacity was in excess of many dealers, he was able to buy and store extra gasoline from Sun Oil when he believed that this discount was high. He would then wait for an increase in retail gasoline prices which would increase his overall profit substantially. When Sun Oil began charging the regular tankwagon price upon delivery and applying the competitive allowance to only *the amount sold*, Butera was prevented from increasing his profits through wholesale price speculation. He filed suit, alleging illegal price maintenance by Sun Oil. There was no evidence, however, that Sun had attempted to dictate retail prices to Butera or any of its other retailers. As a result, the court concluded that despite the obvious effect on retail prices caused by fluctuations in Sun's competitive allowance, this was not of itself illegal.

> ". . . a producer's tight control over its wholesale prices does not become resale price maintenance merely because retail outlets to which it sells, being highly competitive and selling at low margins, are sensitive to every change in wholesale prices." (at 437)

> "The decision as to what margin to use when to change it, and consequently what retail price to charge remains Butera's, and we agree that such economic impact as follows from Sun's tight control of its own wholesale pricing is not a Sherman Act violation." (at 438)

Although these decisions are not factually identical to the present case, the analysis they provide is applicable nonetheless. CX has shown only that Westinghouse increased its wholesale price to CX and discouraged direct competition with one other distributor, because its entire pattern of distribution was being disrupted by the advantage given to CX. As in *Carbon Steel, supra,* and *Butera, supra,* there is no evidence that Westinghouse attempted to restrain trade by dictating resale prices to CX or any of its

other distributors. Westinghouse did not restrict CX in its competition with the distributors of other manufacturers, nor is there evidence that the company objected to competition between its own distributors. Instead, it appears to have made an effort to avoid giving one distributor an advantage over another by its inequitable wholesale prices. As we view the evidence, it shows only that once Westinghouse determined that it had made a mistake in not dealing equally with all its distributors, it decided to withdraw the special price it had originally given to CX. Without more, Westinghouse's activities are not *per se* violations of Section 1 of the Sherman Act.

We must decide more than this, however. We are required by *Chisholm Brothers, supra,* to consider whether the purpose of these practices and their effect on competition constitutes a combination in restraint of trade. We perceive no substantial evidence upon which to base an inference that Westinghouse acted in furtherance of antitrust objectives. Instead, the company's objective was to maintain good working relations with all its distributors rather than giving an unfair advantage to just one or two. In the context of modern business relations operating under the requirements of the Robinson-Patman Price Discrimination Act, 15 U.S.C § 13 et seq., this seems perfectly appropriate. If anything, the company's purpose was to maintain competition between numerous distributors rather than allowing CX to dominate the field.

■ We must also decide whether these activities constitute an attempt to monopolize trade or commerce under Section 2 of the Act. To establish liability for an attempt and conspiracy to monopolize, CX was required to prove that Westinghouse possessed a specific intent to acquire unlawful monopoly power.[5]

The evidence does not support this conclusion. Instead, it indicates that by its decision, Westinghouse intended to stabilize its pattern of distribution, which had been disrupted by the contract with CX. No evidence was presented to show that Westinghouse intended to drive CX out of the photo-flash business or sought to create a monopoly through its other distributors. After a brief period of several weeks, Westinghouse offered to complete the order at the same prices offered to its other distributors. Although the breach of contract benefited Westinghouse to loss of CX, we are convinced that it was the result of legitimate business motives and not for the purpose of obtaining monopolistic power.

*Westinghouse's Claims of Error:*

1) *Admission of Parol Evidence.*

A central issue during the trial of this case was whether or not Westinghouse ever had accepted CX's Master Purchase Order. Westinghouse contended that because the M.P.O. had never received home office approval, its own Photo-Flash Lamp Distributor Franchise agreement was controlling, and that in any case the P.F.D. was controlling as to drop shipments, because the M.P.O. was silent on this subject. Westinghouse therefore argues that Leonard Tall's testimony regarding drop shipment was inadmissible as parol evidence that modified a written contract.

■ ■ The M.P.O. was accepted by the jury as the governing document. Its terms provide for further supplements in respect to shipping instructions:

"First shipment to be made this week, per shipping instructions herewith, and balance to be shipped on three remaining shipping dates, per instructions to be given to Westinghouse prior to each shipping date."

5. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *United States v. Griffith,* 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Chisholm Brothers Farm Equipment Co. v. International Harvester Company,* 498 F.2d 1137, 1144 (9th Cir. 1974).

This procedure is permitted by Washington's version of the Uniform Commercial Code, which recognizes that sales contracts are frequently written so as to provide for later additions of particulars. RCW 62A.2–311(1) provides:

> "An agreement for sale which is otherwise sufficiently definite (subsection (3) of RCW 62A.2–204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness."

Although Washington's Code prohibits the use of parol evidence to modify a completed agreement, it does permit testimony of this nature to complete the terms of an unfinished contract. RCW 62A.2–202 (1974) provides:

> "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

Leonard Tall's testimony was appropriate to clarify the unspecific terms of the Master Purchase Order.

Furthermore, the M.P.O. is not silent on the issue of drop shipment, as Westinghouse contends. Instead, it implies that drop shipments were to be made. Under the section entitled "Shipping Procedures" it requires that the:

> "Buyer will furnish to Westinghouse two copies of buyer's packing slip for *each shipment to each location.*"
>
> "Seller will attach to white copy of buyer's packing slip, seller's packing slip and copy of bill of lading covering *that particular shipment to that location.*" (emphasis added)

Subsection (a) of RCW 62A.2–202 allows a contract to be explained or supplemented by parol evidence as to normal trade usage or course of performance between the particular parties. Tall's testimony was therefore appropriate for these purposes as well, in order to clarify the contract.

### 2) *Jury Instructions.*

Westinghouse objects to four jury instructions which it believes were incorrectly given by the district judge, and also to the court's failure to give seven other instructions as requested by Westinghouse. We have considered each of these separately and conclude that those given fairly informed the jury of the various points of law involved and the others were properly withheld.

### 3) *Antitrust Exhibits.*

One of Westinghouse's requested jury instructions concerned the dismissal of CX's vertical antitrust claim. Westinghouse suggested to the court that confusion might result if the jury was not instructed that this claim had been dismissed. It also asked that the exhibits relating to this claim be excluded from the jury's consideration. The court decided to follow a different procedure, however.

> Mr. Hall: All right, another matter that I would like to suggest to the Court is how do we segregate the exhibits in the jury's mind, all of the exhibits and irrelevant testimony now about the antitrust claim, and I would suggest—
>
> The Court: Well there isn't going to be any antitrust in the instructions, and I will tell them that they follow my instructions and that is it. I will tell them what they are to consider, and what they are not to consider.
>
> Mr. Hall: Well, I am thinking in terms of exhibits that will go with them to the jury room.
>
> The Court: Well if the exhibits go to the jury room, and they have no

bearing on the particular issues as far as this case is concerned, they are to disregard the exhibit; only as it relates to the claim that I am submitting to them, that is all; that is the way I will handle that.

Westinghouse contends that it was prejudicial to allow the jury to consider these exhibits.

■ We find nothing inappropriate about this procedure. True to his word, the trial judge gave no antitrust instructions and did not mention this claim while instructing. He specifically informed the jury that they were to follow his instructions and not to consider matters unrelated to the specific issues of the case. Furthermore, we agree that use of these exhibits by the jury was appropriate in determining Westinghouse's motive for its breach of contract. Although the original verdict in favor of CX was $2,955 more than had been requested, this was due to an earlier mathematical error that had caused an incorrect figure to be entered on the damage chart which the jury considered. The court reduced the award to the proper amount with the consent of the parties. We find nothing to indicate that these exhibits were used by the jury for any purpose other than a consideration of the contract claims referred to in the court's instructions.

### 4) *Freight Charges.*

The jury returned two separate verdicts, one for Westinghouse and one for CX. It made no deduction for freight charges from the amount awarded to Westinghouse as payment for the photo-flash lamps already delivered. However, in awarding CX the full amount of its contract counter-claim, the jury assumed that the freight charges for the undelivered cases would be paid by Westinghouse. Westinghouse contends that these results are contradictory, and that the district court erred in refusing to correct them by subtracting the amount of the freight charges on the undelivered lamps from the award to CX.

■ Although these verdicts appear confusing, they are neither contradictory or incorrect. Throughout its negotiations with CX, Westinghouse clearly recognized an obligation to either assume the cost of shipment or provide an acceptable substitute. Both Tom Ryan and Fred May testified that they had arranged with Leonard Tall a substitution of merchandise coupons as a suitable replacement. The jury heard evidence and was entitled to find that for those cases of photo-flash lamps actually shipped to CX, merchandise coupons were received in satisfaction of Westinghouse's obligation to assume freight costs. This amount was therefore not subtracted from the award to Westinghouse. However, for the undelivered cases, performance by Westinghouse would have necessarily included either drop shipments, payment of shipping costs, or the equivalent in merchandise. CX received none of these because the lamps remained undelivered. To place the parties where they would have been had full performance occurred, an award including these costs was required. The jury's decision to charge Westinghouse for shipping costs on the undelivered cases, but not for the cases already delivered, was therefore not contradictory, and the court committed no error in allowing both verdicts to stand.

### 5) *Interest.*

Westinghouse received interest on only $33,384.40, the difference between the two verdicts. The company contends that because its claim was liquidated, it should have received interest on its full claim of $121,419.40 instead.

McCormick provides the following definition of a liquidated claim:

"A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid

out, and claims for goods or services to be paid for at an agreed rate." [6]

CX does not dispute that Westinghouse's demand for payment was a liquidated claim.

■■■ Washington law requires that for a liquidated claim, interest must be paid from the time the debt is incurred. *Beedle v. General Investment Co.*, 2 Wash.App. 594, 599, 469 P.2d 233, 236 (1970); *Ivan's Tire Service Store, Inc. v. Goodyear Tire & Rubber Company*, 10 Wash.App. 110, 127, 517 P.2d 229, 240 (1973). By the same rule, no interest is awarded on unliquidated claims where damages are not immediately determinable. CX does not contend that its claim was liquidated, nor did it ask for interest.

*Mall Tool Co. v. Far West Equipment Co.*, 45 Wash.2d 158, 177, 273 P.2d 652, 663 (1954), provides an exception, however, where a liquidated claim and an unliquidated counter-claim or set-off arise from the same or unitary contract:

> "There is a rule, however, applicable under certain circumstances, that the amount found to be due on a liquidated or determinable claim may be reduced by the amount found to be due on an unliquidated counterclaim or setoff, and that interest will be allowable only on the balance remaining after the reduction has been made. This rule is applicable only when the amount to which a defendant is entitled as a counterclaim or setoff is for defective workmanship or other defective performance by the plaintiff, of the contract on which his liquidated or determinable claim is based, of a character such that the award of damages as compensation is regarded as constituting either a reduction of the amount due the plaintiff or a payment to him. This is on the theory that the plaintiff is entitled to interest only on the amount of which he has been de-

prived of the use during the period of default." [7]

A set-off was not allowed in *Mall Tool* and interest was awarded on the entire amount of the plaintiff's claim because the claim and counterclaim had arisen under separate and distinct portions of the contract. However, the rule regarding unitary contract claims remained unchanged.

> "In the instant case, if Far West were claiming that defective workmanship in the saws made them unsaleable or reduced their value, or resulted in a need for repairs to make them saleable or in other damage, we would have a basis for the application of the above rule. But Mall's breach of its exclusive distributorship contract with Far West involved a separate (bilateral) feature of the contract and *had nothing directly to do with the sale of goods, wares, and merchandise to Far West or the amount due therefor.*" (emphasis added) [8]

This court has recognized a similar exception. In *Fluor Corporation v. United States ex rel. Mosher Steel Company*, 405 F.2d 823 (9th Cir. 1969), it upheld a judgment for materials furnished and services rendered by Mosher Steel in the fabrication of steel for the defendants. Mosher received stock in one of the defendant corporations under a plan of reorganization, as partial payment of its claim. The appellate court found that the stock represented an unliquidated interest, because its value was uncertain, but concluded that Mosher Steel's claim for payment was determinable and therefore liquidated. In allowing interest on only the difference between Mosher Steel's claim and the value of the stock, the court reasoned as follows:

> "Thus, even though the existence of an unliquidated counterclaim or set-off

---

6. C. McCormick, *Damages*, § 64, 213 (1935).

7. *Accord, Dickinson Fire & Pressed Brick Co. v. F. T. Crowe & Co.*, 63 Wash. 550, 115 P.

1087 (1911); *Barbo v. Norris*, 138 Wash. 627, 245 P. 414 (1926).

8. *Mall Tool*, 45 Wash.2d at 179, 273 P.2d at 664.

necessarily puts the amount payable in doubt, it is well settled that it does not render the claim itself uncertain or deprive the claimant of the right to prejudgment interest.[9] If the unliquidated set-off or counterclaim is based upon a breach unrelated' to the sum due under the primary claim, interest is allowed on the entire claim. The amount of the counterclaim or set-off as determined at trial is then deducted from this total. If, as in the present case, the unliquidated set-off or counterclaim constitutes a partial payment of the primary claim, interest is allowable on the balance due after deducting the amount of the set-off or counterclaim as determined at trial." (at 830)

 This rule was correctly applied to the present case. CX suspended payment on its Master Purchase Order when Westinghouse indicated that it did not intend to complete delivery as required by the contract. RCW 62A.2–610(c)[10] permits such an anticipatory repudiation and Washington case law is in accord.[11] Although these circumstances do not excuse CX from its obligation to pay interest on goods already delivered and for which payment was due, it is clear that CX's refusal to pay was integrally related to its counterclaim for damages. Under the M.P.O., CX contracted for 90,000 cases of photo-flash lamps, to be delivered in four separate shipments. When Westinghouse refused to make the final three deliveries, CX suffered damages and incurred the cost of purchasing cover goods. Recognizing that these expenses were directly related to the same contract under which the first delivery had been made, CX refused to make further payment. Its counterclaim for damages arose from the same

contract provision, creating what we believe was a unitary contract situation as defined by both *Mall Tool, supra,* and *Fluor Corporation, supra.* We are unpersuaded by Westinghouse's argument that this is not a unitary contract situation because each delivery constituted a separate feature of the contract. Instead, since both claims arose from a single contract, the district court was correct in using a set-off procedure to determine the interest to be paid to Westinghouse.

Affirmed.

---

**9.** Citing *Mall Tool, supra,* among other cases.

**10.** § 2–610 "When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may (c) in either case suspend his own performance or proceed in accordance

with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2–704)."

**11.** *Jacks v. Blazer,* 39 Wash.2d 277, 235 P.2d 187 (1951).