AMERICAN OIL COMPANY, a
corporation, Appellee,

v.

Lawrence S. McMULLIN, Appellant.

No. 73–1459.

United States Court of Appeals,
Tenth Circuit.

Argued July 8, 1974.

Decided Jan. 6, 1975.

David S. Cook, Salt Lake City, Utah (Arthur H. Nielsen, Earl Jay Peck, and Nielsen, Conder, Hansen & Henriod, Salt Lake City, Utah, with him on the brief), for appellant.

Walter T. Kuhlmey, Kirkland & Ellis, Chicago, Ill. (Richard J. Goetsch, Chicago, Ill., and Wayne C. Durham, Durham & Swan, Salt Lake City, Utah, with him on the brief), for appellee.

Before LEWIS, Chief Judge, and BREITENSTEIN and SETH, Circuit Judges.

SETH, Circuit Judge.

This litigation involves the several problems arising from various contractual relationships between American Oil Company and Lawrence S. McMullin relating to the operation of a bulk distribution point, retail truck stop and service station, and cafe at Elko, Nevada. According to the characterizations developed in the several contracts, McMullin leased the facility from American, was its commissioned employee-agent insofar as operation of the bulk distribution plant was concerned, and was a branded American dealer as to operation of the truck stop, service station, and cafe. McMullin operated the facility for ap-proximately two years until he became insolvent and American cancelled the lease and retook possession of the facility.

This action originally began as simultaneous attachment proceedings in the state courts of Nevada and Utah which were removed and purportedly consolidated in the United States District Court for the District of Utah. The removal and consolidation created some procedural difficulties which were discussed in a prior opinion reported at 433 F.2d 1091. The case is now before us on the merits, having taken the form of a suit by American to recover various contractual obligations allegedly owed by McMullin with McMullin counterclaiming and asserting that American has violated provisions of the Sherman and Robinson-Patman Antitrust Acts and has made fraudulent misrepresentations to him in the course of their dealings. After allowing McMullin various setoffs, the trial court entered judgment in favor of American in the amount of $98,840.84 and against McMullin on his counterclaims. McMullin appeals from that judgment.

Prior to January 1967 the Elko facilities were owned and operated by Slim Olson, a large independent jobber who also operated similar facilities in Ely and Winnemucca, Nevada, and Bountiful, Utah. Olson customarily purchased his liquid fuels from American at its Salt Lake City refinery for wholesale and retail distribution from his four operations. Olson was the only distributor of American branded products in northern Nevada. While he billed his operations as "cut-rate," Olson was free to set both his wholesale distribution prices and his retail station prices.

Early in 1967 American determined that it would be to its advantage to acquire control of Olson's bulk distribution operations, and it purchased substantially all of Olson's assets at the four locations. The company thus assumed operation of the Elko facilities until it could find a suitable bulk plant agent and station operator. That person was the de-

fendant McMullin, a longtime employee and truck driver for American.

The negotiations between American and McMullin commenced in April 1967. American outlined the operation to him and showed him its projections as to sales volumes and profit margins from the bulk distribution point, the service station, and the cafe. McMullin was told that he would be required to make a minimum capital investment of $10,000. He decided to accept the proposals and assumed operation of the Elko facilities on May 26, 1967, after receiving training in bulk plant procedures and truck stop operations. In accepting, McMullin executed several form agreements with American which established a multifaceted relationship between the parties. These contracts can best be examined as they relate to the different phases of the Elko operation.

McMullin executed American's standard lease agreement by virtue of which he became the lessee of all of the Elko facilities, including the truck stop, the cafe, the bulk distribution point, and all buildings, tanks, pumps, and other fixtures. The rental was in the form of a one cent per gallon charge on all retail gasoline sales and five per cent of the gross receipts from the restaurant operation. The lease was for a term of one year.

The two principal agreements relating to the bulk distribution operation denominated McMullin as an employee-agent of American for the sale of petroleum products other than liquefied petroleum gas (LPG), and for the sale of LPG respectively. Under these agreements American retained ownership and risk of loss as to all products at the bulk plant. McMullin was compensated by a commission on all bulk plant sales, the amount of the commission varying according to the distance from the plant to the customer. The record shows that most of the bulk plant customers were consumers, that is, farmers, ranchers, and other commercial users. There were, however, some retailer customers, the principal one being McMullin himself. American

retained the authority to establish the bulk plant prices, which were customarily lower to consumer users than to dealers such as McMullin. American also limited the geographical area in which bulk sales could be made. Under the agreements McMullin assumed the operational expenses of the bulk plant which included any additional necessary employees. McMullin was also required to provide delivery trucks, which he purchased from Slim Olson. Under his employment contracts McMullin could make two types of credit sales from the bulk plant. The first was to established American customers with authorized credit, and on these American assumed the credit risk. McMullin could also extend credit to any other customer. These accounts were carried by American but the ultimate risk was on McMullin. The employment contracts could be terminated on thirty days' notice.

The remaining group of contracts pertained to McMullin's retail dealership. The Elko station was the only American branded station within a forty-mile radius. American's signs were prominently displayed, and its trademarks were on the fuel pumps as well as in various other places in the station area. Under the retail agreements, McMullin was treated as an independent dealer with the latitude to set his own retail prices and to deal in products other than American's if he wished. His fuel pumps were, however, connected directly to the bulk storage tanks, and, since American controlled access to those tanks, the physical arrangement was such that, absent any substantial alterations, his gasoline and diesel fuel came from the bulk plant which he also operated. American recommended retail prices to McMullin, but he was free to set his own prices independently, and he did this on more than one occasion. McMullin's status as an American branded dealer allowed him the option of participating in a variety of programs sponsored by American. Perhaps the one of most significance to this lawsuit was the Trucker's or Yellow Credit Card program. This was a contract pricing arrangement that American

offered fleet or trucking accounts whereby American agreed to supply fuels to the fleet customer at a specified price. The customer was issued a yellow credit card as evidence of the agreement. As a participating dealer McMullin would supply fuels to the yellow credit card holders and bill them at the contract prices. American would then replace the fuels so supplied by McMullin and pay him a service fee for handling the transaction. McMullin's participation in the Yellow Credit Card program, as well as in American's standard credit card program, was voluntary. McMullin also contracted with American to purchase a minimum of 100,000 gallons of regular gasoline annually in return for certain discounts, and contracted to keep the station open on a twenty-four-hour basis and to pay a surcharge on all gasoline in return for which American would pay all utility bills.

In addition to the above agreements, American also provided McMullin with the necessary financing to assume the operation. As was mentioned, McMullin had to make an initial capital investment of $10,000. American then advanced an additional $30,096.96 in the form of a Dealer Stock Loan and $14,743.08 in the form of an Agent Truck Loan. Both of these loans were secured by McMullin's inventory and personal property at the site. Monthly installments were set forth in both loans, but McMullin also entered into liquidation agreements providing that the installments could be paid by way of a surcharge applied to his fuel purchases and by withheld commissions on his bulk plant sales.

The record shows that while McMullin continued his operation of the Elko facilities for slightly over two years, his financial difficulties became apparent from the outset. Under the arrangement with American, McMullin's pump prices were essentially at the levels established by Olson, the prior owner, but the price at which McMullin purchased fuels was higher. In short, because of his various arrangements with American, McMullin could never have hoped to realize the margins obtained by Olson.

However, as the trial court found, McMullin's limited marketing position was not the only source of his difficulties. Finding 28 by the trial court contained the following observations:

"McMullin's financial failure at Elko resulted from his having abnormally large and uncontrolled costs and expenses, from his being badly undercapitalized, McMullin's only capital contribution being a $10,000 loan from a bank which was paid off from gross receipts of the business in 1968, from his having inadequate books and records which did not permit McMullin to know where he stood financially at anytime, and from large withdrawals from the business by McMullin. These withdrawals were at least $75,000 and may have amounted to as much as $115,000 during the 25½ months of McMullin's operations in Elko."

The record shows that American made a number of concessions to McMullin in order to help him overcome his difficulties. By various riders to the lease agreement, American forgave all rent otherwise accruing on the cafe and portions of the rent accruing from gasoline sales. This totaled in excess of $28,000. American also permitted McMullin to haul petroleum products from its Salt Lake City refinery and paid him common carrier rates therefor, allowed him a higher commission retroactively on his bulk plant sales, and increased his service fees on yellow credit card sales.

By the spring of 1969, however, McMullin's position had deteriorated to the point that American offered him a mutual cancellation of their agreements and a return to his former employment. McMullin refused, and, as a final effort, American loaned him an additional $31,-200 to meet current tax obligations. This last measure was to no avail, and McMullin's position continued to deteriorate until July 16, 1969, when the Internal Revenue Service closed and padlocked the Elko facilities for nonpayment of taxes. At approximately the same time American learned that McMullin had been diverting proceeds from the

bulk plant sales to meet his current business obligations rather than forwarding them to American as required by his employment contract. Based upon this latter activity and the IRS seizure, American terminated the employment contracts and the lease agreements. It then paid the asserted tax indebtedness and, after making inventory of the stock and equipment on hand, commenced operation of the business.

We have indulged in this rather lengthy exposition of the facts of this case in order to bring the legal issues more clearly into focus. The appellant has thrown up a barrage of assorted arguments, most of which depend upon a fact situation fundamentally different from that found below. We believe the foregoing recitation of the facts accords with the findings of the trial court as those findings were in turn developed by the record. The remainder of our discussion will be divided into three basic parts: the claims upon which American was granted judgment, the antitrust counterclaims, and the other claims asserted by McMullin.

AMERICAN'S CLAIMS.

The various claims on which American recovered totaled $121,407.33. Against this there were offset items totaling $22,566.49, leaving a net judgment of $98,840.84. American does not challenge any of the offset items. The judgment awarded American was divided into several components.

■ A. *The IRS Lien Account:* American was awarded $18,067.19 as the amount which it paid to obtain release of the tax lien against the Elko premises. As found by the district court, payment of the lien amount was the only method by which American could obtain possession and resume business operations without extensive delay. McMullin apparently challenges this portion of the award only on the basis that American's payment was made voluntarily, with no express contractual right or obligation to assume McMullin's tax indebtedness, and without properly seeking to contest the

amount of the lien. These contentions are without merit. It was McMullin himself who first notified the Internal Revenue Service that he would be unable to meet his tax liabilities, and the trial court found that this was done with the hope of forcing American to assume his tax liabilities. Even though American's interest in the facilities and the secured collateral could not have been subjected to the tax lien, it nevertheless had a strong interest in keeping the business operating. Thus its actions were more than those of an intermeddler, and it was properly subrogated to the tax claim. *See* generally New York Casualty Co. v. Sinclair Refining Co., 108 F.2d 65 (10th Cir.).

■ B. *Cash Shortages Account:* American was awarded $12,164.41 as the amount which McMullin owed for sales from the bulk plant to his own retail operation. Because the retail pumps were connected directly to the bulk storage tanks, McMullin was not billed for purchases from the bulk plant until the fuel was actually dispensed to retail customers. He was required to submit weekly reports of the fuels so purchased, and at the time the Internal Revenue Service closed McMullin's operation this amount, which includes the amount of a check drawn by McMullin and returned for insufficient funds, was owed. McMullin challenges only the sufficiency of the evidence to support this award. We find that it was supported by the evidence and testimony.

C. *Unauthorized Credit Accounts:* The terms of McMullin's employment contracts required him to assume the risk of credit extended to customers who had not been approved by American. At the time his contracts were terminated, McMullin was carrying over $100,000 in such "unauthorized" credit sales. By the time of trial American had succeeded in collecting all but $31,560.91. At that point American elected to exercise its right under the contracts to proceed against McMullin for the balance then owing. McMullin does not dispute the construction or effect given to the con-

tractual provision, but challenges only the sufficiency of the evidence to support the amount of the award. Again, we find sufficient evidence to support the award of $31,560.91 on the unauthorized credit account.

■ *D. Attachment Account:* As mentioned, this action was originally commenced by American as simultaneous attachment proceedings in the state courts of Nevada and Utah. The actions were removed, and the parties attempted to consolidate them in the trial court below. On the previous interlocutory appeal in this matter, we held that the consolidation was improper, and ordered the Nevada action remanded to the United States District Court for the District of Nevada. *American Oil Co. v. McMullin,* 433 F.2d 1091 (10th Cir.). The record indicates that the Nevada writs of attachment were subsequently quashed, which order was affirmed by the Ninth Circuit in an unpublished order of affirmance. *American Oil Co. v. McMullin,* No. 72–1043 (Ninth Circuit, August 6, 1973). The trial court in this action did not rule expressly on the Utah attachments.

The court below awarded a total of $15,207.85 to American as reimbursement for expenses incurred in connection with the attached property items. Most of these expenses were incurred in satisfying the claims of prior lienholders on the property, mostly trucks, attached. From our examination of the record, it appears that most of the property items were actually attached in Nevada by authority of the Nevada writs. In view of our previous decision and the decision of the Ninth Circuit, we cannot consider the expenses related to those attachments a proper subject of this action. We find insufficient evidence otherwise to justify any award attributable to attachment expenses, and the portion of the judgment below so attributed is set aside. We express no opinion on the validity of the Utah attachments.

*E. Remaining Accounts and Offsets:* The remainder of American's award included uncontested amounts of $2,212.57, owed by McMullin on his personal credit account with American, and $42,194.40. The latter amount represents collections which McMullin received as bulk plant agent, but which he diverted to his own use rather than remitting to American as required by his contract. McMullin was awarded various offsets totaling $22,566.49 which are also uncontested.

Based on the foregoing discussion, then, the judgment awarded American must be reduced by $15,207.85 to a total of $83,632.99. It is otherwise affirmed.

## THE ANTITRUST COUNTERCLAIMS.

Most of McMullin's arguments on appeal are directed to the trial court's rejection of his antitrust counterclaims. As mentioned previously the counterclaims alleged violations of both the Sherman Act and the Robinson-Patman Act, but the allegations principally concern monopolization in violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

In studying McMullin's complaints and the record made below, we are convinced that he has confused the elements of a business arrangement, restrictive upon him, with practices condemned by the antitrust laws. McMullin repeatedly accuses American of "monopolizing his business." In a sense that accusation might be true, in that there is "monopolization" in every form of ownership. The record shows that with a capital investment of $10,000, McMullin took the reins of an operation in which American had invested over $900,000. It would be inconceivable in such circumstances that American would not retain a substantial interest in and control over the business. McMullin's antitrust allegations must, therefore, be considered against this background.

McMullin bases his Sherman Act arguments largely on three cases: *Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371; *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98; and *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249. He also ar-

gues vigorously that, with respect to the bulk distribution operation, he should be characterized as some type of independent dealer or contractor rather than as an employee-agent, as he was described in his contract with American. The thrust of his case is that American subjected him to illegal territorial and price restrictions stemming from its control over the bulk distribution operation and prevented him from competing for customers which he might otherwise attract. In other words, McMullin argues that by nominally separating the Elko operation into two distinct components and contracting with McMullin as employee-agent on the one hand and as lessee-dealer on the other, American sought to accomplish an illegal objective by a purely formal arrangement.

The record suggests that American's principal objective in acquiring the Elko facilities from Slim Olson was to assure its continued control over the bulk distribution point. American had obviously determined that it would realize greater returns by operating the bulk plant itself as opposed to continuing to sell to Olson as an independent jobber from its Salt Lake City refinery. It would thus follow that American's contracts with McMullin would be designed to protect this control over the bulk distributions.

■ There would be little benefit derived from enumerating the various indicators of an employer-employee relationship as they are manifested in McMullin's bulk agent contract with American. The mere fact that McMullin as an employee assumed some of the operational expenses and certain business risks associated with the bulk plant does not compel us to disregard this characterization. Furthermore, we find ample justification for segregating the bulk plant operation from the truck stop. Despite their presence at the same site, they were naturally two distinct operations, and each was well established in the industry. We note that the contracts executed by McMullin were basically form agreements. We find nothing which would persuade us to characterize the relationship of the parties other than as they characterized it themselves.

■ Neither can we find anything in American's ownership and operation of the bulk plan violative of the Sherman Act. McMullin has never challenged American's acquisition of the Elko facility. To the contrary, the record indicates that during the year in question, American's share of branded motor fuel sales in Nevada never exceeded two per cent, a figure which hardly suggests monopoly power. American does not deny that it established bulk sales prices and limited the territory served by the plant. While these practices would obviously create problems were McMullin an independent distributor, we do not find anything in Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, or in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249, which would condemn them in the case of a producer wholesaling its own product.

■ McMullin strongly urges that his bulk agent arrangement with American is analogous to the consignment arrangement condemned in Simpson v. Union Oil Co. While it is not difficult to discover many similarities in the arrangements, one significant distinction is equally apparent. The particular evil which was identified in *Simpson* was the use of a product consignment plan whereby the supplier, by ostensibly retaining *ownership* of the various products while in the hands of *otherwise independent dealers,* was able to control *retail* prices. The result was that dealers who were tied to the particular supplier were unable to participate effectively in a highly competitive market. But it must be emphasized that the dealer involved in the *Simpson* case was in most respects an independent businessman, and the Court found that the consignment arrangement existed only for the purpose of controlling retail prices. Thus the Court was not making a blanket condemnation of consignment arrangements, but, rather, it was holding that a formal consign-

ment contract could not be used to conceal an illegal price-fixing agreement.

We have already concluded that as to the bulk plant operation, McMullin was an employee of American and not an independent businessman. Not only did American retain title to the products until sold, but the sales were made in its name as well. In fact, McMullin as dealer made purchases from the bulk plant in the same manner as any other dealer-customer. While the arrangement between Simpson and Union Oil was limited to the consigned products, McMullin contracted with American as an employee. American provided the facilities and equipment with the exception of the delivery trucks which it leased from McMullin. He continued his retirement plan, health and accident insurance, and employee savings plan. It is true that McMullin's compensation was in the form of sales commissions rather than a salary, and that from these commissions he had to deduct various operating expenses. Nevertheless, it must be presumed that the bargained rate of commission was intended to embrace those expenses and still provide adequate compensation to McMullin as sales agent. That McMullin in his capacity as employee assumed some of the overhead and received compensation in the form of commission rather than salary does not make his status as an employee a sham. We find nothing in *Simpson* which would prohibit a manufacturer from distributing its own products and thereby controlling wholesale distribution prices. Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, merely established the boundaries of the *General Electric* holding; it did not overrule it. United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. *See also* United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249.

McMullin in his capacity as the operator of the truck stop was clearly an independent businessman. There is no evidence of an attempt by American to coerce him to maintain any particular retail price. Prices were suggested by American, but the evidence shows that McMullin did not always adhere to them, and no reprisals against him were taken. This condition existed also through a brief price support period. This is not a Lehrman v. Gulf Oil Corp., 464 F.2d 26 (5th Cir.), type of case.

The contract for the station operation did not require McMullin to buy all his products from American, and no evidence was offered that there was any such requirement. Furthermore, McMullin did not contend it was an exclusive dealing contract. He did sell other motor oils and other products not provided by American. There was no evidence of coercion by the seller or contractual requirement for exclusive dealing. The fact that the pumps were connected directly to the bulk plant is obviously a factor to consider, but we do not regard it to be determinative in the face of the other facts and conditions. There is no indication that McMullin wanted to buy gasoline or diesel fuel from any other source. This station was the only American brand retail facility within forty miles in any direction along the principal roads. As indicated above, American had something less than two per cent of the market in the area in question.

McMullin also alleges a variety of other Sherman Act transgressions, many of which are resolved as a result of our decision on the distribution arrangement. Additional comment on these allegations is unnecessary. We have considered them and found that they are without merit.

██ We shall also comment briefly on the Robinson-Patman price discrimination allegations. These allegations are directed at two levels. First, McMullin contends that American violated 15 U.S.C. § 13 by making products available to other major oil companies at its Salt Lake City refinery at prices lower than those at which McMullin could purchase. Second, McMullin alleges a similar viola-

tion in American's practice of selling products from the bulk plant to consumer customers at prices lower than those available to McMullin as a dealer. The same fallacy infects both contentions. An essential element of price discrimination violative of the Robinson-Patman Act is a deleterious effect on competition. Courts have traditionally interpreted this requirement as meaning the discrimination in prices must be between potential competitors or at least result in a discriminatory price differential as between potential competitors. *See* Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1 (7th Cir.); 16H Business Organizations, Von Kalinowski, Antitrust Laws and Trade Regulations § 68.04, and cases cited therein. A brief examination of McMullin's complaints shows that requirement is not satisfied.

At its Salt Lake City refinery, American supplies petroleum products to other major oil companies under an exchange arrangement by which it gets reciprocal treatment at their refineries. The record does not show that these transactions are actually sales. The arrangement is for the obvious purpose of avoiding the need for each company to maintain a refinery in each geographical area in which it operates. If they are customers of American's, these companies are not prospective retailers, or even wholesale distributors. Rather they are first level purchasers who will dispense their products through jobbers or distributor-agents to various retail outlets. As such they are not in competition with McMullin directly, and if anything, they are competitors of American. Furthermore, if it is significant, there has been no showing or allegation that the "prices" available to such companies are of such magnitude as to enable their various retailers or distributor-agents to compete in a more favorable position than McMullin. Thus the discount prices are at most representative of the recognized legitimate practices of functional level pricing. See Von Kalinowski, *supra,* at § 68.04[1].

A similar analysis applies to American's bulk distribution pricing. McMullin objects because consumer customers of the bulk plant received a more favorable price than did McMullin as a dealer. McMullin neither alleged nor proved that his dealer tankwagon price varied from that given other dealers. By definition the consumer customers would not be involved in the resale of the products which they purchased. Thus they were not in competition with McMullin as a dealer, nor, obviously, could McMullin expect to compete with American for their business. Von Kalinowski, *supra,* at § 68.04[3]. Therefore, in neither instance has McMullin demonstrated any adverse effect on competition resulting from the alleged price discrimination.

## McMULLIN'S OTHER CLAIMS.

The remaining claims asserted by McMullin are resolved for the most part by reference to our earlier summary of the facts. McMullin contends that he was fraudulently or deceptively induced to assume the business by reason of various misrepresentations as to the expected profitability of the venture, and that the resultant contracts, by reason of the disparity in bargaining positions of the parties, are unconscionable and therefore unenforceable. We find no merit in either contention.

American apparently did offer McMullin some predictions as to operating expenses, receipts, and profitability of the Elko operation. However, the trial court's specific finding, supported by the evidence, was that those predictions were offered only as estimates based on American's study of Slim Olson's operation and projected bulk plant and truck stop sales. Furthermore, a period of some four months elapsed between the time McMullin first expressed interest in the business and the signing of the contracts. During this time McMullin had free access to the business records and physical facilities, and presumably he had ample opportunity to make whatever independent evaluation he desired.

Nor can we find evidence to support McMullin's contentions that any of the figures were knowingly exaggerated, or that pertinent information was otherwise knowingly concealed. In fact, the trial court found that in some respects American's projected sales volumes were exceeded by McMullin's actual experience.

Likewise, we are unable to find that McMullin was coerced to enter the various contracts, or that their provisions were unconscionable. Again, the record shows that McMullin had ample time to deliberate before consenting to the various agreements. While the contracts were, for the most part, form agreements, McMullin could presumably have bargained for material alterations. That presumption is further supported by American's subsequent adjustment of commission rates and rentals in an effort to assist McMullin in resolving his financial problems.

Finally, we find no evidence whatever to support McMullin's contentions that American wrongfully took possession of the premises or converted his property. American did not act until the Internal Revenue Service had padlocked the facility. From that point, as the trial court found, its actions were based on its contractual rights as governed by the Nevada version of the Uniform Commercial Code.

In closing, we would add these final observations: It has been over five years since this action was commenced. The proceedings have been delayed on several occasions to enable the defendant McMullin to engage in extensive and unlimited discovery. Trial in the district court consumed seven days, and those days included proceedings lasting well into the evening. We are convinced that McMullin has been afforded ample opportunity to present his claims. In the last analysis, we must agree that he entered a bargain with unfortunate consequences both for him and American. Nevertheless, neither the antitrust laws nor other statutory or common law provides refuge from the results of an unfortunate bargain when it has knowingly and willingly been formed by the parties.

The portion of the judgment attributable to the attachment account is reversed, and the judgment in favor of American is ordered to be reduced to $83,632.99. The decision and judgment of the district court is otherwise affirmed.