Alfred H. HARDWICK,
Plaintiff-Appellant,

v.

NU–WAY OIL CO., INC., and Billy Delp,
Defendants-Appellees.

No. 78–1530.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1979.

Rehearing and Rehearing En Banc
Denied March 26, 1979.

Bill Blackburn, Joseph Bonner Dorsey, Corpus Christi, Tex., for plaintiff-appellant.

Kendrick & Kratzig, Paul G. Kratzig, Corpus Christi, Tex., for defendants-appellees.

Before INGRAHAM, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

Plaintiff Hardwick and his wife, Marcelina Meza Hardwick, entered into an agreement in September of 1968 with defendant Nu-Way Oil Company, one of three corporations directed by defendant Billy Delp, to operate a self-service gasoline station on U.S. Highway 77 in Ricardo, Texas. The Hardwicks were lessees (and later owners) of real estate upon which they constructed a small building to house a drive-in grocery store. Pursuant to the agreement with the Hardwicks, at this same site Nu-Way installed the gasoline pumps, tanks and electronic consoles necessary to the operation of a self-service gasoline station. Nu-Way supplied the gasoline, purchased from a third party, on consignment to the station operators and retained the sole right to set the price of the gasoline at the pump. Nu-Way and its two related companies supplied gasoline in this manner to approximately 200 stations in a four-state area.

In March of 1971 plaintiff Hardwick leased, with an option to buy, another Highway 77 site approximately one-half mile from his original location. He constructed a building at this new location and, after Nu-Way declined to supply gasoline to him at the new site, he entered into a supply contract with Mohawk Petroleum Company and began a gas station/fast-food service operation in October of 1971. The old location was closed, and all business dealings between plaintiff and Nu-Way were terminated. In the meantime, Marcelina Meza Hardwick, from whom plaintiff had become estranged, entered into negotiations with Nu-Way to reopen the station at the old location. She obtained a supply contract with Nu-Way and reopened the station in November of 1971. This contract, essentially the same contract as the earlier one between Nu-Way and plaintiff, provided as before that Nu-Way had the sole right to set the price of gasoline at the pump. Within six weeks, plaintiff closed his business at the new location and never reopened it.

The operation of the station at the old location at all times pertinent to this appeal was the same: the station operator ordered gasoline from Nu-Way's supplier whenever the tanks needed replenishing; Nu-Way paid for the gasoline, installed and maintained the gasoline sales equipment at its own expense, and paid the operators either a fixed monthly sum or a fixed sum plus one cent per gallon sold; the operator furnished the land and the building for the convenience store and gasoline pumps and hired any personnel needed; the station operators performed no service in the gas station operation other than to collect money from drivers, who were required to fill their own tanks and to account regularly to Nu-Way for the total amount collected.

Plaintiff brought this action under section 4 of the Clayton Act,[1] alleging that Nu-Way's contract with his wife was an illegal price-fixing agreement and was a per se violation of section 1 of the Sherman Act.[2] After extensive pretrial discovery and on stipulated facts, both parties filed motions for summary judgment. Plaintiff's motion was denied, and defendants' was granted.[3] We affirm.

Plaintiff's complaint alleges that defendants Nu-Way Oil Company and Billy Delp,

---

**1.** 15 U.S.C. § 15 authorizes treble damage relief and provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court . . . and shall recover threefold the damages by him sustained . . . .

**2.** 15 U.S.C. § 1 provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal.

**3.** The lower court based its ruling on two grounds: it held that plaintiff did not have standing under § 4 of the Clayton Act to complain of this alleged price-fixing violation and that even if standing were assumed, summary judgment must be granted because there was no illegal price fixing in this case. *Hardwick v. Nu-Way Oil Co.*, 443 F.Supp. 940 (S.D.Tex. 1978). We express no opinion on the district court's analysis of the standing issue. In considering the legality of the agreement at issue, we shall assume *arguendo* that plaintiff had standing to maintain the suit.

along with co-conspirators Marcelina Meza Hardwick, Dynamic Industries, and Economy Oil Company, engaged in a combination and a conspiracy in restraint of trade in violation of section 1 of the Sherman Act. The crux of this allegation is that the agreement between Marcelina Hardwick and Nu-Way Oil expressly fixed the retail price of gasoline sold to the public and was used by them to implement a scheme of predatory pricing, which resulted in destruction of plaintiff's competing business. Plaintiff argues that *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), prohibits such an agreement. Defendants answer that the agreement is a valid consignment and that *Simpson* has no application in this case. Therefore, it is necessary for us to consider *Simpson* and its effect on the agreement at issue in some detail.

■ An agreement between a seller and its buyer fixing the price at which the buyer may resell the product is a per se violation of section 1 of the Sherman Act. *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1961); *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). For a time it was thought that a supplier could safely avoid the constraints of the *Dr. Miles* rule by consigning the inventory to independent distributors with a price-fixing provision in the consignment agreement. The Supreme Court, in *United States v. General Electric Co.*, 272 U.S. 476, 488, 47 S.Ct. 192, 196, 71 L.Ed. 362 (1926), held that there was no antitrust violation where the "owner of an article patented or otherwise," sought to sell his articles directly to the consumer by utilizing a "genuine contract of agency" and "fixing the price by which his agents transfer the title from him directly to such consumer." Widespread use of the consignment device to avoid antitrust liability for resale price maintenance, however, was dealt a severe blow by the Court in *Simpson v. Union Oil Co., supra.*

In *Simpson* the plaintiff was a year-to-year lessee of a retail outlet of Union Oil. He was required to sign a consignment agreement, under which title to the gasoline remained in the consignor Union Oil, and the retail price of the gasoline was set by Union. The company paid all property taxes on the gasoline, but the retailer was required to carry personal liability and property damage insurance because of the consigned gasoline, and he was responsible for all losses of the gasoline except for acts of God specified in the agreement. Simpson was compensated by a commission tied to the retail price of the gasoline, and he had to pay all costs of operating the retail outlet. When Simpson sold gas below the fixed price, Union refused to renew his lease and terminated the consignment agreement.

The Court refused to apply the *General Electric* precedent to uphold the consignment agreement in *Simpson*. Instead, the Court, relying on the substance of the agreement rather than its form, held that the "consignment" was in fact resale price maintenance, coercively employed, and was illegal under the antitrust laws. The decision is apparently not, however, an unequivocal condemnation of the use of the consignment device to set retail prices. The Court expressly stated that "an owner of an article may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner." But when a "'consignment device' is used to cover a vast gasoline distribution system, fixing prices through many retail outlets," the Court held that the consignment must yield to the antitrust laws. *Simpson v. Union Oil Co.*, 377 U.S. at 21–22, 84 S.Ct. at 1057. *General Electric* was limited but not overruled. Instead, the Court distinguished the earlier case on the narrow ground that the consignment agreement there involved patented articles.[4]

■ Since the decision in *Simpson*, neither the Supreme Court nor this court has defined further the circumstances in which a manufacturer or supplier may utilize the

---

4. Justice Stewart, in dissent, thought the distinction was "specious." He viewed *Simpson* as overruling *General Electric* for all practical purposes. 377 U.S. at 26–27, 84 S.Ct. 1051.

consignment device to establish prices at the retail level. It is clear that if the manufacturer undertakes the capital investment and other expenses itself, as well as the inventory risk, and resells through its own outlet, *Simpson* does not apply. L. Sullivan, Handbook of the Law of Antitrust § 137 at 389 (1977). Less clear is when a manufacturer may establish retail prices for his goods where, as here, there is incomplete integration forward to the retail level. The *Simpson* Court's opinion has to two main underpinnings. The first element relied upon by the Court was that the Union Oil "consignees" were in fact independent businessmen, having "all or most of the indicia of entrepreneurs, except for price fixing." *Simpson v. Union Oil Co.*, 377 U.S. at 20, 84 S.Ct. at 1056. The second element stressed by the Court was the vastness of the distribution system and the pervasiveness of the price fixing accomplished by it. *Id.* at 22, 84 S.Ct. 1051.

Commentators have disagreed about the scope of the *Simpson* decision and its effect on the use of consignments,[5] but the courts generally have not interpreted *Simpson* as a blanket condemnation of all consignment agreements in which the manufacturer/supplier sets retail prices. *See, e. g., Call Carl, Inc. v. B. P. Oil Corp.*, 554 F.2d 623, 627–28 (4th Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Pogue v. International Industries, Inc.*, 524 F.2d 342, 345 (6th Cir. 1975); *Greene v. General Foods Corp.*, 517 F.2d 635, 652–53, 656 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *American Oil Co. v. McMullin*, 508 F.2d 1345, 1351–52 (10th Cir. 1975); *Hardin v. Houston Chronicle Publishing Co.*, 434 F.Supp. 54, 56–57 (S.D.Tex.1977), *aff'd*, 572 F.2d 1106 (5th Cir. 1978); *Roberts v. Exxon Corp.*, 427 F.Supp. 389, 390–91 (W.D.La. 1977); *Goldinger v. Boron Oil Co.*, 375

F.Supp. 400, 406–09 (W.D.Pa.1974), *aff'd*, 511 F.2d 1393 (3d Cir. 1975). This court has stated that *Simpson* must be read to prohibit resale price maintenance devices "where the risks of the distribution process are borne largely by numerous otherwise independent individuals or firms in competition with each other in a product for which there is a widespread demand on the level of the individual consumer." *Greene v. General Foods Corp.*, 517 F.2d at 653. Our task, then, is to analyze the substance of the agreement between Nu-Way and Marcelina Meza Hardwick; if we find that it contains the elements proscribed by *Simpson*, then we must hold that it is, as a matter of law, illegal per se and a violation of section 1 of the Sherman Act. Using this analysis, we find that, in her operation of the gasoline station, Marcelina Hardwick did not possess the "indicia of entrepreneurs" vital to the Court's rationale in *Simpson*.[6] Therefore, she was, for purposes of the antitrust laws, operating a company station as an employee, and there was no illegal price fixing.

■ We turn to the agreement itself, to the discovery papers and to the stipulated facts for our analysis of this agreement in light of *Simpson*. Resolution of this issue is not without difficulty, because Marcelina Meza Hardwick exercised some attributes of an independent operator, while possessing as well many of the attributes of a Nu-Way employee. Several attributes of independent operation are apparent. The agreement itself provided that the station operator was to be considered an independent contractor. Moreover, the self-service gasoline station, operated by plaintiff and Marcelina Hardwick together and later by her alone, was located on realty leased and later owned by the Hardwicks. They operated a small drive-in grocery in conjunction with the gas station, and Nu-Way did not

5. *E. g.*, Handler, *Recent Antitrust Developments—1964*, 63 Mich.L.Rev. 59 (1964); Rahl, *Control of an Agent's Prices: The* Simpson *Case—A Study in Antitrust Analysis*, 61 Nw.U. L.Rev. 1 (1966); 78 Harv.L.Rev. 279 (1964); 17 Stan.L.Rev. 519 (1965); 43 Tex.L.Rev. 569 (1965).

6. The defendants also argue that its distribution system was not sufficiently vast to require application of the *Simpson* rule. We need not express an opinion on this contention because of our holding concerning the indicia of Mrs. Hardwick's independence.

participate in the grocery business in any way. Nu-Way did not pay Social Security taxes on or withhold income taxes from the compensation paid to the Hardwicks. The station operator furnished any personnel required to staff the grocery store and to collect for gasoline sales and also had all tax liability for the real estate serving as the site for the business. The station operator was responsible for the operating expenses of the two businesses. At no time did any sign at the station hold it out to the public as a Nu-Way gasoline station.

Yet, with respect to operation of the gasoline station, the indicia of an employment relationship are many. The agreement gave Nu-Way the right to install, at its sole cost, gasoline pumps, tanks, and electronic consoles that were necessary to operate a self-service gasoline station. Nu-Way retained all ownership of the gasoline sales equipment and maintained and repaired this equipment at its sole expense. Neither plaintiff nor his wife ever carried insurance covering damage to the gasoline equipment, nor did they pay any taxes applicable to the gasoline nor any personal property taxes on the gasoline sales equipment. Nu-Way alone acquired and kept current all permits and licenses required by law for the gasoline sales operation and retained title to the gasoline itself until it was sold through the pump to the consumer. Marcelina Meza Hardwick was paid a fixed salary of $325 monthly without regard to the retail price of the gas or the number of gallons sold.[7] Finally, the agreement provided that the station operator held the gas as a "consignee" of Nu-Way Oil.

For gasoline sales, the station operator only had the responsibility of collecting money from the customer. The customer would drive to the pump, service his vehicle himself, and then go into the convenience store to pay for the gasoline. The operator would verify the amount purchased on the electronic consoles inside the store and then would collect the money. The operator performed no collateral services such as body repair work, lubrication, battery checks, oil changes, tire repair, tire checks, or even cleaning windshields. The operator was required to account weekly to Nu-Way for the sales registered on the pumps; to this end the station operator read the pumps daily and deposited the total dollar volume directly into a Nu-Way bank account. A Nu-Way supervisor verified the deposits by coming to the station twice a month to read the pumps and to check the bank deposits.

We agree with the lower court that no illegal price-fixing agreement existed. We are mindful that contract terms such as "consignee" or "independent contractor" do not control an antitrust analysis, but the substance of this agreement was that Marcelina Meza Hardwick was, as was her husband before her, a Nu-Way employee, with respect to the sale of gasoline, for purposes of the antitrust laws. In *Simpson*, as here, the contract between the parties provided that the price of gasoline would be set and changed solely at the instruction of the supplier. Yet there are significant differences in the two agreements. The *Simpson* station operator was responsible for all losses of the consigned gasoline, save specified acts of God. Moreover, his financial return was directly linked to the retail price of gasoline; if prices set by his supplier were not competitive, financial loss was his because he had no guaranteed income. He was truly a "small, struggling competitor" who had all of the economic risks inherent in his position as an independent businessman but none of the correlative power to set competitive prices. The station operator's situation in the instant case presents a vivid contrast. While the agreement, as we have noted, is not devoid of indicia of independent operation, we believe that the station operator here involved in the Nu-Way distribution system was, in effect, a salaried part-time cashier. Nu-Way retained title to the gasoline and was responsible for all damage or loss to it until it was sold at the pump. More important, Nu-Way continued to bear the financial risks of the market

---

7. Plaintiff, before he gave up the station, was initially paid $225 monthly and later $75 monthly plus one cent per gallon sold, without regard to the price of the gasoline or its quality.

place; Marcelina Hardwick was not affected by any pricing decision made by Nu-Way in that her salary remained constant regardless of the retail price of the gasoline. Any financial loss caused by market decline was absorbed by Nu-Way, not by the station operators.

The policy underlying prohibition of resale price maintenance was articulated recently by this court in *Greene v. General Foods Corp., supra*:

> The ban on resale price maintenance that has developed from *Dr. Miles* through *Parke, Davis, Simpson,* and *Albrecht* has in part been premised upon the belief that, when a manufacturer undertakes to distribute its goods through a chain of independent dealers, the consumers' ability to purchase at a free market price will be enhanced by the retailer's unfettered ability to set his retail price at the level he feels is most commensurate with local demand. See especially *Dr. Miles.* Moreover, the condemnation of retail price maintenance is also premised upon respect for the autonomy of independent dealers in the chain of distribution, regardless of any demonstration of increased competition with respect to the sale to ultimate consumers. *Topco.* This concern for the autonomy of independents grows in part from the view that competition at all levels of the distributive process is desirable and in part from the view that a manufacturer utilizing independent distributors and investing them with substantially all the risks of wholesale and retail distribution must also invest them with the signal prerogative of the independent businessman—the power to set his own price. *Simpson.*

517 F.2d at 656. We hold that the agreement between Nu-Way and Marcelina Meza Hardwick did not involve illegal price fixing because the station operator had no independence with regard to the gasoline sales, even though she was an independent businesswoman with regard to the convenience-store operation. Although the two businesses were located at the same site, they were two separate and distinct operations and should be analyzed separately for antitrust purposes. *See American Oil Co. v. McMullin,* 508 F.2d at 1351. Nu-Way station operators were simply not in the position of independent retailers who purchased gasoline for resale to the public; in reality, they were little more than salaried conduits to enable Nu-Way Oil to make retail sales directly to the consumer. Because a retailer is entitled to set the price at which it sells its own products, *Simpson v. Union Oil Co.,* 377 U.S. at 21, 84 S.Ct. 1051; *Call Carl, Inc. v. B. P. Oil Corp.,* 554 F.2d at 623–24; *Goldinger v. Boron Oil Co.,* 375 F.Supp. at 408–09, there was no violation of section 1 of the Sherman Act in the instant case.

Accordingly, the district court is AFFIRMED.