Boochever, Circuit Judge, concurred specially and filed opinion.

**Eli MESIROW and Thomas Morris, Plaintiffs-Appellants,**

**v.**

**PEPPERIDGE FARM, INC., a Connecticut corporation, Defendant-Appellee.**

No. 81–4471.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1982.

Decided Jan. 25, 1983.

Maxwell Keith, San Francisco, Cal., for plaintiffs-appellants.

Forrest A. Hainline, III, Cooper, Kirkham, Hainline, San Francisco, Cal., for defendant-appellee.

Before DUNIWAY, FLETCHER and BOOCHEVER, Circuit Judges.

DUNIWAY, Circuit Judge:

Plaintiffs Eli Mesirow and Thomas Morris appeal from the district court's dismissal on summary judgment of their claims against Pepperidge Farm, Inc., under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. They also ask us to review two orders imposing fines on their counsel during discovery. We affirm the dismissal of the antitrust claims, and decline to review

the discovery sanctions for lack of jurisdiction.

## I. *Facts.*

Plaintiffs distributed Pepperidge Farm biscuits, cookies and other products from January 1970 to May 1978, and from April 1970 to November 1978, respectively. The terms of the relationship between plaintiffs and Pepperidge were set down in "consignment agreements" that designated the distributors as self-employed independent businesspersons. The agreements established a dual system of accounts for Pepperidge distributors, including plaintiffs: chain stores of three or more retail stores billed directly by Pepperidge, and chain or individual stores that distributors billed. Pepperidge employees regularly visited the stores of its direct-billed accounts to check on service and arrange promotional displays, but distributors such as plaintiffs actually delivered and installed the Pepperidge Farm products in these stores, as they did in the other stores. In all cases, Pepperidge retained title to the goods until they reached the retailers' shelves. Accordingly, it bore the risk of loss or theft of the goods, even while they were in the hands of the plaintiffs. It also paid applicable inventory and property taxes on the goods.

Both during the relevant Fair Trade period and after, Pepperidge set the wholesale prices to be charged direct-billed customers, which paid Pepperidge directly; plaintiffs were forbidden to negotiate different prices with them. Plaintiffs were free, however, to solicit these customers to be their own. Plaintiffs set wholesale prices for their own accounts, which included both chain and individual stores.. Pepperidge employees did not help on these accounts unless plaintiffs asked them to do so.

Pepperidge gave each of its distributors, including plaintiffs, the exclusive right to solicit and sell to stores within a specific geographical territory. Though distributors were thus prohibited from selling to retailers outside their territories, they were permitted to, and plaintiffs did, within those areas, distribute other manufacturers' goods in addition to Pepperidge's. Distrib-

utors paid their own operating costs of deliveries to the customers Pepperidge billed directly as well as to their own customers. In addition, they were required to absorb the cost of products that went stale while sitting in their warehouses or on retailers' shelves in their territories.

Plaintiffs, who are step-brothers, operated their Pepperidge distributorships jointly. They several times "split" their territories by selling to others the right to deliver Pepperidge Farm products within portions of those areas. Pepperidge terminated Mesirow's franchise for cause in May 1978. Morris sold his franchise later that year.

Plaintiffs' complaint alleged that Pepperidge violated §§ 1 and 2 of the Sherman Act both during and after the Fair Trade period, and breached its contracts with plaintiffs. Pepperidge counterclaimed, alleging trademark infringement, breach of contract, fraud and money due on rolling account. On cross motions for summary judgment, the trial court dismissed plaintiffs' antitrust claims, and entered judgment under F.R.Civ.P. 54(b). Plaintiffs filed a timely appeal from that judgment. The notice refers only to "the judgment entered pursuant to Fed.R.Civ.P. 54(b) ... on September 4, 1981."

## II. *The Antitrust Claims.*

### A. *Pepperidge Farm Accounts: Post-Fair Trade Period.*

Plaintiffs first contend that Pepperidge's practice, after the repeal of Fair Trade laws, of fixing the wholesale prices charged its direct-billed customers was a *per se* violation of § 1 of the Sherman Act as defined by *Simpson v. Union Oil Co. of California,* 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98. That case held a purported "consignment" arrangement between an oil company and a retailer illegal because it prohibited the retailer from setting its own resale prices for the oil company's product.

*Simpson,* however, does not outlaw every consignment arrangement. There is "nothing illegal" about a system in which an owner of an article sends it to a dealer who undertakes to sell it only at a

price determined by the owner. 377 U.S. at 21, 84 S.Ct. at 1057. Three factors distinguish the Pepperidge consignment agreement at issue here from the *Simpson* arrangement: the agreement here set wholesale, not retail prices; Pepperidge, not the plaintiffs, bore the greater burden of risk during the consignment period; and the agreement did not coerce the plaintiffs as the *Simpson* contract did. We need not decide here whether any of these factors alone would prevent application of the *Simpson* rule to the consignment agreement here. Together, they bar a finding that the Pepperidge agreement was *per se* illegal.

### 1. *Wholesale price fixing.*

Simpson was a retailer of the defendant oil company's products. Plaintiffs were wholesale distributors of Pepperidge products. The trial court concluded that *Simpson* "is not a holding that may be extended automatically to the wholesale level," and we have been unable to find express authority to the contrary.

Plaintiffs argue that *Greene v. General Foods Corp.,* 5 Cir., 1975, 517 F.2d 635, supports the application of *Simpson* to a wholesale distributorship. Plaintiff Greene in that case distributed coffee goods to "large institutional buyers" such as motel chains. *Id.* at 639, 642 n. 4. But the court clearly assumed that he was a retailer, not a wholesaler. *Id.* at 652. We have once considered applying *Simpson* to a contract between a producer and wholesalers. In *Westinghouse Electric Corp. v. CX Processing Laboratories, Inc.,* 9 Cir., 1975, 523 F.2d 668, a wholesale distributor alleged *per se* antitrust violations in the form of vertical price fixing by a manufacturer. Citing *Simpson,* we affirmed the dismissal of the claim for lack of evidence. 523 F.2d at 674. *See also American Oil Co. v. McMullin,* 10 Cir., 1975, 508 F.2d 1345, 1351–1352, affirming a judgment against a bulk distributor of oil products that had charged a producer with *Simpson* violations. In neither case did the court specifically decide whether *Simpson* could bar a consignment agreement involving a wholesaler instead of a retailer. Thus, we are not prevented from holding that the wholesale context of the agreement in the case before us is at least a factor in immunizing Pepperidge from *Simpson* illegality.

Language in *Simpson* itself supports such a conclusion. As the trial court noted, the Court in that case repeatedly used the term "resale price maintenance," which is a term of art usually referring to the retail level. At one point, the Court explicitly stated: "Nor does § 1 of the Sherman Act tolerate agreements for *retail* price maintenance." 377 U.S. at 18, 84 S.Ct. at 1055 (emphasis added). Plaintiffs attempt to represent the *Simpson* holding as a ban on "resale pricing," but there is nothing in that opinion, which speaks, e.g., of a "retail merchant," 377 U.S. at 18, 84 S.Ct. at 1055, and "retail sales," *id.* at 21, 84 S.Ct. at 1057, to directly support its application to wholesalers.

### 2. *Allocation of risk.*

Another factor in our decision is the significantly greater risks borne by Pepperidge than were borne by the defendant in *Simpson.* The *Simpson* Court reviewed various "indicia of entrepreneurs," 377 U.S. at 20, 84 S.Ct. at 1056, possessed by the plaintiff there, concluding that Simpson was in fact an independent businessman burdened illegally by his contract with defendant. Here, however, the risk of entrepreneurship with regard to the direct-billed accounts falls mainly on Pepperidge.

In *Simpson,* although the defendant paid property taxes on the goods and retained title to them until they were finally sold by the retailer Simpson, the retailer was liable for losses or damage to the product while it was in his possession, and was required to insure against such loss. 377 U.S. at 15, 84 S.Ct. at 1053. Plaintiffs were not burdened with the risks and responsibilities imposed on Simpson. Title to the baked goods remained with Pepperidge until delivery to a retailer—and so did liability for losses and damage. Pepperidge, not plaintiffs, purchased insurance against such risks. Although plaintiffs, like Simpson, were responsible for their own operating costs and

received a commission on deliveries, Pepperidge was liable for the risk and expense of billing the customers. Plaintiffs make much of their liability for stale goods, a risk that the trial court found to be "beyond the usual consignment responsibility of properly caring for the consigned product." We do not find incorrect her conclusion that as the risk of stales was one peculiarly within plaintiffs' control, it was not sufficient to make the arrangement *per se* illegal.

Plaintiffs' reliance on *Greene v. General Foods Corp., supra,* on this issue is misplaced. The court in that case found that the defendant had engaged in conduct *per se* illegal under *Simpson,* but the agreement's allocation of the risks of the arrangement was far different from the allocation in the Pepperidge agreement. In *Greene,* plaintiff distributor purchased the goods from defendant manufacturer and resold them. 517 F.2d at 640–641. The distributor held title to the goods and bore the risk of loss or damage to them until they were delivered to his customers. *Id.* The distributor also was responsible for billing the accounts, although the manufacturer bore the risk of default on credit sales. *Id.* Finally, the distributor was charged with promoting the goods and performing the day-to-day tasks necessary to maintain customer satisfaction. *Id.* at 657–658. As we have noted, Pepperidge, in the agreement with plaintiffs, retained title to the consigned goods and bore the risk of loss or damage to them. The goods were consigned to the distributors, not sold to them. In addition, Pepperidge, not the distributors, promoted the goods to the direct-billed accounts and had the sole responsibility of routinely servicing those accounts. And unlike the plaintiffs in *Greene,* Pepperidge's distributors were free to solicit the direct-billed accounts to be their own.

#### 3. *Coercion.*

The third factor that distinguishes the consignment arrangement at issue here from that in *Simpson* is the absence of coercion in the Pepperidge agreement. *Simpson* held that "a supplier may not use coercion on its retail outlets to achieve price maintenance.... [I]t matters not what the coercive device is." 377 U.S. at 17, 84 S.Ct. at 1054. The vice of the consignment in issue there was that it "coercively laced [dealers] into an arrangement under which their supplier is able to impose non-competitive prices on thousands of persons whose prices otherwise might be competitive." 377 U.S. at 21, 84 S.Ct. at 1057. The agreement bound Simpson so tightly that it took from him his "only power" to be a wholly independent businessman—the power to set his retail price. *Id.*

Plaintiffs are unable to demonstrate such coercion here. The *Simpson* Court was concerned with preventing a producer from curbing competition among the sellers of a single brand of product. Here, on the contrary, the evidence shows that Pepperidge distributors were free to solicit the producer's customers to be their own. They were not necessarily bound, therefore, to sell to retailers at prices specified by Pepperidge.

In view of these three factors, therefore, we affirm the trial court's dismissal of plaintiffs' § 1 *per se* claim covering the post-Fair Trade period.

#### B. *Pepperidge Farm Accounts: Fair Trade Period.*

Plaintiffs also challenge the legality of Pepperidge's consignment agreements during the Fair Trade period, from June, 1974 through March, 1976. These agreements set the prices at which distributors sold Pepperidge goods to retailers.

Before 1976, federal law permitted fair trade agreements in which producers set resale prices for their goods. 15 U.S.C. § 1 (relevant part repealed by Pub.L. 94–145, 89 Stat. 801 (1975)); 15 U.S.C. § 45(a)(2)–(5) (repealed by Pub.L. 94–145, 89 Stat. 801 (1975)). Plaintiffs, however, argue that the Pepperidge agreements were illegal because they fixed prices horizontally, in violation of 15 U.S.C. §§ 1 and 45(a)(5), which, before the 1975 amendments, prohibited fair trade agreements "between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors,

or between retailers, or between persons, firms, or corporations in competition with each other." They contend that when Pepperidge set wholesale prices, it competed with its distributors, "who also had potential to set a wholesale price."

Plaintiffs' contention is not, as they claim, supported by *United States v. McKesson & Robbins, Inc.,* 1956, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209. The Court in that case held that §§ 1 and 45(a) did not exempt from antitrust prohibitions an agreement between a producer and a distributor who in fact competed against each other. Defendant manufacturer in *McKesson* sold goods under Fair Trade agreements both to independent distributors and to retailers. As a wholesaler, it competed directly, therefore, with the independent distributors on whom it imposed price restrictions. Pepperidge, on the other hand, sold only through its distributors, who, as the trial court found, profited from all Pepperidge sales, even those that Pepperidge directly billed.

The trial court also found that Pepperidge did no mail order or retail business in competition with its distributors, and plaintiffs have directed our attention to no evidence to the contrary. Pepperidge therefore did not compete "at the same functional level" with its distributors, *McKesson,* 351 U.S. at 313, 76 S.Ct. at 942. As a result, summary judgment for Pepperidge on the antitrust claim covering the Fair Trade period was proper.

### C. *Pepperidge Farm Accounts: Interim Violations.*

■ Plaintiffs complain that the trial court did not respond to their claim that Pepperidge's practice of setting wholesale prices for its direct-billed customers between March 1976, when Fair Trade ended, and May 1977, when Pepperidge consignment agreements were signed, violated § 1 of the Sherman Act. Though the trial court's decision did not discuss the interim allegations specifically, it dismissed them along with plaintiffs' other antitrust claims. We affirm because we find nothing improper in Pepperidge's conduct after the repeal of Fair Trade.

### D. *Distributors' Accounts.*

■ Plaintiffs argue that although Pepperidge claims that distributors were free to set the prices they charged all customers other than those the manufacturer billed directly, Pepperidge used various methods to render that freedom illusory. For example, they refer to a type of account they term a "hybrid direct chain account," in which, they say, the distributor billed at prices set by Pepperidge. But plaintiffs' contention that distributors were not free to set prices for their own accounts is set forth only in Mesirow's declaration filed in opposition to Pepperidge's motion to dismiss. It directly contradicts Mesirow's own earlier deposition testimony that he "always" priced products he sold to stores he billed directly at amounts different from any price that Pepperidge might have specified. Mesirow's conflicting statements do not create a factual dispute sufficient to avoid summary judgment. They raise sham issues. *Radobenko v. Automated Equipment Corp.,* 9 Cir., 1975, 520 F.2d 540, 544.

Plaintiffs also say that Pepperidge sent price lists to distributors' customers as a means of controlling wholesale prices. But the one relevant piece of evidence they submitted is hearsay, and insufficient to create a genuine factual dispute because it was not made on personal knowledge. F.R. Civ.P. 56(e). Plaintiffs further argue that Pepperidge controlled its distributors' wholesale prices by pre-printing a suggested retail price on the packages of its baked goods. But they have not contradicted Pepperidge's showing that retailers could change the pre-printed prices. By itself, the pre-printed price did not violate antitrust restrictions. *Bailey's Bakery, Ltd. v. Continental Baking Co.,* D.Hawaii, 1964, 235 F.Supp. 705, 722, *aff'd,* 9 Cir., 1968, 401 F.2d 182.

### E. *§ 2 Claims.*

Plaintiffs also assign the trial court's dismissal of their claims that Pepperidge mo-

nopolized and attempted to monopolize, in violation of § 2 of the Sherman Act as error. They apparently base their § 2 allegations on the price-fixing claims discussed above and on Pepperidge's practice of encouraging the division of distributors' sale and delivery territories into smaller geographical areas.

### 1. *Monopolization.*

■ Monopoly power in the relevant market is one of the three essential elements of § 2 monopolization. *Forro Precision, Inc. v. International Business Machines Corp.,* 9 Cir., 1982, 673 F.2d 1045, 1058. The trial court found that Pepperidge was not a dominant factor in the relevant market. Plaintiffs argue that the judge's finding should be overturned because she failed to consider the proper submarkets. But the relevant market is a question of fact, and the trial court's finding should not be overturned unless it is clearly erroneous. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 9 Cir., 1982, 676 F.2d 1291, 1299. We do not find it clearly erroneous.

### 2. *Attempted monopolization.*

■ Specific intent and anticompetitive conduct are essential elements of a claim of attempted monopolization. *Forro, supra,* 673 F.2d at 1059. Here, plaintiffs tried to prove the required specific intent with evidence of Pepperidge's anticompetitive conduct. *See id.; California Computer Products, Inc. v. International Business Machines Corp.,* 9 Cir., 1979, 613 F.2d 727, 736–737. Where there is no proof of market power, however, the conduct to support an inference of specific intent to monopolize should be of a kind clearly threatening to competition or clearly exclusionary. *Forro, supra,* 673 F.2d at 1059. Plaintiffs' claims fall far short. We disposed of their price-fixing claims above. As to the splits of territory, as the trial court found, they showed only that Pepperidge encouraged its managers to promote such divisions of distributors' territories. Pepperidge introduced evidence showing the legitimate in-

tent and effects of such conduct, and plaintiffs offered no relevant evidence to contradict that conclusion. Their citation to *Photovest Corp. v. Fotomat Corp.,* 7 Cir., 1979, 606 F.2d 704, is not in point because there the franchisor solicited its franchisee's customers for itself. Here, other distributors are the beneficiaries of route splits.

### III. *Discovery Sanctions.*

■ Finally, plaintiffs ask us to review the discovery sanctions totaling $750 assessed against their counsel. Counsel was ordered to pay $250 in expenses and attorneys' fees following denial of a motion to compel production of documents, and $500 when the trial court denied a request to redepose, after the close of discovery, a Pepperidge employee who had since been discharged from his job.

Leaving aside the question of whether our jurisdiction is proper in view of the fact that plaintiffs' notice of appeal did not mention the discovery sanctions, we lack jurisdiction for another reason. An order imposing a sanction upon counsel, a nonparty, is final and appealable by the person sanctioned, when imposed, *Reygo Pacific Corp. v. Johnston Pump Co.,* 9 Cir., 1982, 680 F.2d 647, 648; *Liew v. Breen,* 9 Cir., 1981, 640 F.2d 1046, 1048. No such appeal was taken. The order imposing the $250 fine was filed June 23, 1980; the order imposing the $500 fine was filed March 16, 1981. Plaintiffs' notice of appeal was not filed until September 10, 1981. We note that in both *Reygo Pacific Corp.* and *Liew, supra,* the appeal was by the non-party who was sanctioned. Assuming, without deciding, that the client can appeal from an order imposing a sanction on his attorney, the appeal is too late. F.R.App.P. 4(a). Therefore, we lack jurisdiction to consider the validity of the sanctions.

The judgment appealed from is affirmed.

BOOCHEVER, Circuit Judge, concurring.

I would not address the issue of whether an attorney in a case may wait until final judgment to appeal sanctions imposed during the earlier course of proceedings. We

have permitted attorneys to file appeals within thirty days from the entry of orders imposing such sanctions, *Reygo Pacific Corp. v. Johnston Pump Co.,* 680 F.2d 647, 648 (9th Cir. 1982); *Liew v. Breen,* 640 F.2d 1046, 1048 (9th Cir. 1981); until now, we have never ruled on whether the attorney's appeal may also be joined with that of the party at the conclusion of the case. There are strong policy reasons against piecemeal appeals which weigh in favor of encouraging the joinder of the attorney's appeal with that of his client.[1] I believe, however, that we have no jurisdiction to resolve the issue at this time.

There were multiple claims and counterclaims filed in this case. On September 4, 1981, the trial judge ruled only on plaintiff's antitrust claims and entered judgment under Fed.R.Civ.P. § 54(b) as to those claims alone. Moreover, the notice of appeal refers only to "the judgment entered pursuant to Fed.R.Civ.P. § 54(b) ... on September 4, 1981." Thus, our jurisdiction is limited to review of those antitrust claims and we have no authority to consider the appeal from imposition of sanctions.

---

1. *Eastern Maico Distributors, Inc. v. Maico-Fahrezeugfabrick,* 658 F.2d 944 (3d Cir. 1981). *See also* C. Wright, A. Miller, C. Cooper 15 *Federal Practice and Procedure,* § 3911, 498–99 (1976).